Filed 10/31/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RICHARD LUERAS, | |
|    Plaintiff and Appellant, | G046799 |
|      v. | (Super. Ct. No. 30-2011-00481113) |
| BAC HOME LOANS SERVICING, LP, et al., | O P I N I O N |
|    Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Kirk H. Nakamura, Judge. Affirmed in part, reversed in part, and remanded. Motion to strike portions of appellant's reply brief. Granted.

Law Offices Of Lenore Albert and Lenore L. Albert for Plaintiff and Appellant.

Reed Smith, David J. de Jesus and Adam M. Forest for Defendants and Respondents.

\*       \*       \*

## INTRODUCTION

Richard Lueras appeals from a judgment entered after the trial court sustained without leave to amend a demurrer to his verified first amended complaint (the First Amended Complaint). After the foreclosure sale of his home, Lueras sued Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP (Bank of America), ReconTrust Company, N.A. (ReconTrust), and Federal National Mortgage Association, commonly called and referred to as "Fannie Mae." The First Amended Complaint asserted causes of action for negligence, breach of contract, violation of the Perata Mortgage Relief Act (Civ. Code, § 2923.5), fraud/misrepresentation, unfair and unlawful practices (Bus. & Prof. Code, § 17200), and to quiet title.

The First Amended Complaint included no allegations directed specifically to Fannie Mae, and we therefore affirm the judgment in its favor. As to Bank of America and ReconTrust, we affirm the judgment as to the causes of action for violation of Civil Code section 2923.5 and to quiet title, but, in all other respects, reverse and remand to permit Lueras to amend the First Amended Complaint.

The key fact alleged in the First Amended Complaint is that a mere 13 days before Bank of America foreclosed on Lueras's home, Bank of America falsely represented in writing to Lueras that no foreclosure sale would occur while Lueras was being considered for "other foreclosure avoidance programs." In so doing, Bank of America expressly and in writing informed Lueras he "will not lose [his] home during this review period." A Bank of America representative also informed Lueras the pending foreclosure sale would be postponed. Nevertheless, days later, Bank of America foreclosed on Lueras's home.

Another key point is the trial court sustained a demurrer without leave to amend to the First Amended Complaint—i.e., Lueras had filed only two complaints in a complicated and evolving area of law before facing dismissal. Given the standard of

2

review and California's policy of liberality in granting of amendments, Lueras should be given an opportunity to amend the First Amended Complaint.

## ALLEGATIONS

In reviewing the order sustaining the demurrer, we accept the factual allegations of the First Amended Complaint as true. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.) We also accept as true facts appearing in exhibits attached to the complaint. (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 245; *Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1626-1627.) If the facts expressly alleged in the complaint conflict with an exhibit, the contents of the exhibit take precedence. (*Sarale v. Pacific Gas & Electric Co.*, *supra*, at p. 245.)

In March 2007, Lueras refinanced his home loan in the amount of $385,000. The monthly payment on the 30-year loan was $1,965.10. To secure the loan, a trust deed against Lueras's home was recorded.

Lueras made every monthly payment due until he and his wife suffered financial hardship. In 2009, Lueras requested a loan modification from the lender, Bank of America, under the Home Affordable Modification Program (HAMP).[1]

In 2009, Fannie Mae instituted the HomeSaver Forbearance program, which was available to those who did not qualify for HAMP loan modifications. According to the First Amended Complaint, "[t]he program was supposed to lead to a

---

[1] "[T]he United States Department of the Treasury implemented the Home Affordable Mortgage Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' [Citation.]" (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 785 (*West*).)

permanent plan so that the borrower could 'save' their [*sic*] home and in the interim offer the owner a 6 month plan reducing the monthly payment by 30% to 50% less than the current mortgage payment." Fannie Mae's Announcement 09-05R,[2] issued in April 2009, stated: "HomeSaver Forbearance is a new loss mitigation option available to borrowers [who] are either in default or for whom default is imminent and who do not qualify for the HAMP. A servicer should offer a HomeSaver Forbearance if such borrowers have a willingness and ability to make reduced monthly payments of at least one-half of their contractual monthly payment. The plan should reduce the borrower's payments to an amount the borrower can afford, but no less than 50 percent of the borrower's contractual monthly payment, including taxes and insurance and any other escrow items at the time the forbearance is implemented. During the six month period of forbearance, the servicer should work with the borrower to identify the feasibility of, and implement, a more permanent foreclosure prevention alternative. The servicer should evaluate and identify a permanent solution during the first three months of the forbearance period and should implement the alternative by the end of the sixth month." (Announcement 09-05R, *supra*, at pp. 31-32 <https://www.fanniemae.com/content/announcement/0905.pdf> [as of Oct. 31, 2013].)

Although Lueras requested a HAMP loan modification, "Bank of America apparently offered [him] the Forbearance program instead of the HAMP program." In a letter dated August 17, 2009, Bank of America notified Lueras that "you qualify for the Fannie Mae HomeSaver Forbearance™ program" and, as a consequence, he was eligible for reduced mortgage payments for a period of up to six months. The letter stated: "Under the HomeSaver Forbearance program, we are working with Fannie Mae, a

---

[2] United States Department of the Treasury, Announcement 09-05R, Reissuance of the Introduction of the Home Affordable Modification Program, HomeSaver Forbearance, and New Workout Hierarchy (Apr. 21, 2009), available at <https://www.fanniemae.com/content/announcement/0905.pdf> [as of Oct. 31, 2013] (Announcement 09-05R).

government-sponsored enterprise, to reduce your mortgage payment by up to 50% for up to 6 months while we work with you to find a long-term solution."

Lueras accepted Bank of America's offer for reduced monthly payments under the HomeSaver Forbearance program by entering into a forbearance agreement (the Forbearance Agreement), which was attached as an exhibit to the First Amended Complaint. The Forbearance Agreement reduced the monthly payments on Lueras's home loan to $1,101.16 for six months, commencing on September 16, 2009. The Forbearance Agreement stated the "Deferral Period Payment" commenced on September 16, 2009, and ended on the earliest of (1) six months from "the execution date by Servicer"; (2) "execution of an agreement with Servicer for another resolution of my default under my loan Documents . . ."; or (3) "my default under the terms of this Agreement." The Forbearance Agreement stated: "The Servicer will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Agreement."

The Forbearance Agreement also stated: "During the Deferral Period, Servicer will review my Loan to determine whether additional default resolution assistance can be offered to me. At the end of the Deferral Period either (1) I will be required to recommence my regularly scheduled payments and to make additional payment(s), on terms to be determined by Servicer, until all past due amounts owed under the Loan documents have been paid in full, (2) I will be required to reinstate my Loan in full, (3) Servicer will offer to modify my Loan[,] (4) Servicer will offer me some other form of payment assistance or alternative to foreclosure, on terms to be determined solely by Servicer . . . , or (5) if no feasible alternative can be identified, Servicer may commence or continue foreclosure proceedings or exercise other rights and remedies provided Servicer under the Loan Documents."

Lueras made the monthly payment of $1,101.16 for a period of 10 months. During that time, Bank of America did not work with Lueras to identify the feasibility of,

5

much less implement, a more permanent foreclosure prevention alternative; Bank of America did not evaluate and identify a permanent solution during the first three months of the deferral period; and Bank of America did not implement a permanent solution by the end of the sixth-month period.

Meanwhile, Lueras submitted to Bank of America all information required to determine whether he qualified for a HAMP loan modification. In October 2010, while Lueras waited for Bank of America's determination, he was served with a notice of default by the trustee, ReconTrust. The notice of default stated the total amount in arrears was $64,424.98 as of October 19, 2010. It was not until this notice of default was recorded that Bank of America began to explore with Lueras alternatives to foreclosure. At that point, Lueras enlisted the aid of the California Attorney General's Office, which agreed to monitor and assist with the loan modification process on behalf of Lueras.

In December 2010, Lueras requested a loan modification package from Fannie Mae. In January 2011, Lueras returned the completed package to Fannie Mae, which sent a copy of it to Bank of America. The completed package included over 100 pages of documents from Lueras.

In February 2011, Lueras was served with a notice of trustee's sale with a scheduled sale date of February 22, 2011. Bank of America rescheduled the sale date a total of four times, ultimately setting the sale for May 18, 2011.

The First Amended Complaint alleged that Bank of America eventually determined Lueras was eligible for a HAMP loan modification and made an oral offer to modify the loan. Lueras accepted the offer. But, the First Amended Complaint also alleged that, in a letter dated May 5, 2011, Bank of America informed Lueras he was not eligible for a HAMP loan modification. The May 5, 2011 letter, which was attached as an exhibit to the First Amended Complaint, stated Bank of America was reviewing Lueras's financial information "to determine if there are other options available to you" and that Bank of America "will contact you within 10 days to let you know what other

6

options are available to you and the next steps you need to take." The May 5 letter also stated: "If a foreclosure sale of your home is currently pending and on hold, that hold will continue and remain in effect while you are considered for other foreclosure avoidance programs." While advising Lueras not to ignore any foreclosure notices, the letter stated, "you will not lose your home during this review period."

Lueras immediately contacted Nancy Whitaker of Bank of America, who told him the May 5, 2011 letter was sent by "a third party 'home retention' vendor" and was an error. Whitaker told Lueras that he had been placed in an approved program in which the interest rate on his loan would be reduced for four years. She advised him that Bank of America needed to obtain Fannie Mae's approval.

In a letter to Lueras, dated May 6, 2011, Bank of America informed him it was reviewing his financial documents to determine whether he was eligible for a HAMP loan modification. The May 6 letter, which was attached as an exhibit to the First Amended Complaint, stated Lueras would receive one of three possible responses: (1) notification he had been approved for a trial period plan under HAMP, (2) notification he was not eligible for a HAMP loan modification, or (3) more information was needed to make a decision.

Lueras immediately contacted Bank of America about the May 6 letter. He was informed the letter was sent in error as his application had already "been approved" by Bank of America. Whitaker told Lueras the trustee's sale, which had been rescheduled for May 18, 2011, would be reset, pending approval by Fannie Mae. On Lueras's copy of the May 6, 2011 letter is this handwritten note: "per Nancy [¶] 'sent in error' . . . [¶] 5/18 reset . . . [¶] already approved."

During May 2011, Lueras made many contacts with Fannie Mae, Bank of America, and the California Attorney General's Office, but "[n]o response was ever received stating why the foreclosure was proceeding." Lueras never received a further response—oral or written—from Bank of America, advising whether he was or was not

7

eligible for a loan modification program. He likewise never received notice from Fannie Mae that it had denied him a loan modification.

According to the First Amended Complaint, the Making Home Affordable program guidelines require the loan servicer to wait 30 days from the date of denial of a HAMP loan modification before foreclosing so the borrower can appeal the decision.

On May 18, 2011, Lueras was informed by the California Attorney General's Office that the foreclosure sale would be conducted on that date. Minutes later, Lueras's home was sold at the foreclosure sale to H and K Acquisitions, LLC. H and K Acquisitions, LLC, was named as a defendant in the First Amended Complaint but is not a party to this appeal.

### PROCEDURAL HISTORY

Lueras filed this lawsuit in June 2011. The complaint asserted causes of action for negligence, breach of contract, breach of contract (third party beneficiary), fraud/misrepresentation, unfair and unlawful practices, and to quiet title. The trial court sustained, with leave to amend, a demurrer by Bank of America, ReconTrust, and Fannie Mae.[3]

Lueras filed the First Amended Complaint, which asserted causes of action for negligence (against Bank of America, ReconTrust, and Fannie Mae), breach of contract (against Bank of America and Fannie Mae), violation of Civil Code section 2923.5 (against Bank of America and ReconTrust), fraud/misrepresentation (against Bank of America and Fannie Mae), unfair and unlawful practices (against Bank of America and Fannie Mae), and quiet title (against Bank of America, ReconTrust, and Fannie Mae). The trial court sustained without leave to amend Bank of America, ReconTrust, and Fannie Mae's demurrer to the First Amended Complaint and ordered it

---

[3] The trial court sustained the demurrer without leave to amend as to plaintiff Mary Lueras, and that ruling has not been challenged.

8

dismissed with prejudice.  Lueras timely appealed from the subsequently entered judgment of dismissal.


## MOTION TO STRIKE PORTIONS OF LUERAS'S REPLY BRIEF

Bank of America, ReconTrust, and Fannie Mae move to strike several portions of Lueras's reply brief referring to a December 19, 2007 letter, of which Lueras requested we take judicial notice.  The motion is made on the ground the request for judicial notice was improper and, therefore, those portions of Lueras's reply brief, which reference the December 19, 2007 letter, should be stricken.  We grant the motion.

California Rules of Court, rule 8.204(a)(1)(C) states an appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."  We may decline to consider passages of a brief that do not comply with this rule.  (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 195.)  As a reviewing court, we usually consider only matters that were part of the record when the judgment was entered.  (*Ibid.*)

By separate order, we previously denied Lueras's request for judicial notice; we therefore decline to consider those portions of Lueras's reply brief which are supported solely by the December 19, 2007 letter.  Those portions are (1) on page 4, the first full paragraph beginning "On December 19, 2007 Congress received letters"; and (2) from page 19, the fourth full paragraph beginning "In the letter dated December 19, 2007" through the third full paragraph on page 20, ending "investors would not lose their dividends."


## STANDARD OF REVIEW

We independently review a ruling on a demurrer to determine whether the pleading alleges facts sufficient to state a cause of action.  (*McCall v. PacifiCare of Cal.,*

9

*Inc.* (2001) 25 Cal.4th 412, 415.) In so doing, "[t]he complaint must be liberally construed and survives a general demurrer insofar as it states, however inartfully, facts disclosing some right to relief." (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22.)

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, . . . [w]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law. [Citations.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse. [Citation.]" (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

At the outset, and as part of our discussion of the standard of review, we address the argument that some or all of Lueras's claims are not viable because the foreclosure sale has been rescinded and "any equity Lueras might have in the property remains." In opposition to the demurrer to the First Amended Complaint, Lueras acknowledged, "the trustee was able to rescind the foreclosure sale" and, in his reply brief, argues, "[t]he rescission of the trustee's deed upon [sale] does not moot Mr. Lueras'[s] claims."

In reviewing the judgment, we are limited to the well-pleaded facts of the complaint and matters subject to judicial notice. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126; *Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433.) The First Amended Complaint did not allege rescission of the foreclosure sale. No party has requested we take judicial notice of anything establishing such rescission. No party has explained what "rescission" means in this context, briefed

10

the legal consequences of a rescission on possible future attempts to foreclose, or informed us of the status of any current foreclosure proceedings. No party has argued that statements of Lueras's counsel constitute judicial admissions.

In short, nothing in the record permits us to consider the foreclosure sale to have been rescinded or the legal significance of any such rescission in reviewing the judgment and the sufficiency of the First Amended Complaint. Whether a rescission of the foreclosure sale occurred and the legal significance of a rescission is better resolved in the trial court, after Lueras has the opportunity to replead and, as necessary and permitted, upon concrete evidence. Further, assuming there was a "rescission" of the foreclosure sale, we cannot say as a matter of law at this stage that Lueras cannot plead any cause of action.

## DISCUSSION

## I.

## Negligence

In the first cause of action of the First Amended Complaint, for negligence, Lueras alleged Bank of America and ReconTrust breached a duty of care in the handling of his application for a loan modification and in foreclosing his property. Bank of America and ReconTrust argue Lueras failed to allege, and cannot allege, the existence of a duty of care.

A. *Overview of the Law of Negligence and Relevant Allegations of the First Amended Complaint*

To state a cause of action for negligence, a plaintiff must allege (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's damages or injuries. (*Thomas v. Stenberg* (2012) 206 Cal.App.4th 654, 662.) Whether a duty of care exists is a question of law to be determined on a case-by-case basis. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472.)

11

We start by identifying the allegedly negligent conduct by Bank of America and ReconTrust because our analysis is limited to "the specific action the plaintiff claims the particular [defendant] had a duty to undertake in the particular case." (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 280.) In the first cause of action, Lueras alleged that Bank of America and ReconTrust owed him a duty of care to (1) handle his loan "in such a way to prevent foreclosure and forfeiture of his property"; (2) "determine modification approvals, explore and offer foreclosure alternatives with Mr. Lueras prior to default"; (3) "exercise reasonable care and skill in timely and accurately responding to customer requests and inquiries"; (4) "record proper land records"; (5) "properly service the loan"; (6) "ensure chain of title prior to foreclosing"; and (7) "stop all foreclosure sales that are unlawful."

Lueras alleged Bank of America and ReconTrust breached that duty of care in several ways. Most importantly, Lueras alleged Bank of America and ReconTrust had a duty to offer Lueras a loan modification and breached that duty by refusing to do so. He also alleged Bank of America and ReconTrust breached their duty of care by "failing to timely and accurately respond to customer requests and inquiries," by "failing to comply with state consumer protection laws, properly service the loan, and use consistent methods to determine modification approvals," and by "failing to . . . record proper land records . . . and ensure chain of title prior to foreclosing and to stop all foreclosure sales that are unlawful."[4]

Lenders and borrowers operate at arm's length. (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 466; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579; *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476, disapproved on other grounds in *Riverisland Cold Storage, Inc. v.*

---

[4] In the appellant's opening brief, Lueras argues that Bank of America's "unreasonable delay in the loan modification process" led to the foreclosure of his home. No such allegation appears in the First Amended Complaint.

12

*Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182.) "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).)

In *Nymark*, *supra*, 231 Cal.App.3d at page 1092, the court held a lender owed no duty of care to a borrower in preparing an appraisal of the real property security for the loan when the purpose of the appraisal is to protect the lender by satisfying it that the collateral provided adequate security for the loan. The court reached this holding by considering the six factors identified in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) to determine whether to recognize a duty of care. (*Nymark*, *supra*, at p. 1098.) Those factors are (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (*Ibid.*)

The *Nymark* court stressed the purpose of the appraisal was to protect the lender's interest and was not intended to assure the borrower the collateral was sound or to induce him to enter into the loan transaction. (*Nymark*, *supra*, 231 Cal.App.3d at p. 1099.) The foreseeability of harm to the borrower—who would know the value of his own property—was remote, the connection between the lender's conduct and the injury suffered was "tenuous," there was "no moral blame because [the borrower] was in a position to protect himself from loss," and a strong public policy prevented imposing on the lender a duty of care in the preparation of an appraisal. (*Id.* at pp. 1099-1100.)

In *Ragland v. U.S. Bank National Assn.*, *supra*, 209 Cal.App.4th at page 207, a borrower contended the lender misadvised her to miss a loan payment in order to be considered for a loan modification. The borrower alleged the lender

13

negligently caused her severe emotional distress by then failing to modify her loan and selling her home in a foreclosure sale. (*Id.* at p. 205.) Affirming summary adjudication of a cause of action for negligent infliction of emotional distress, a panel of this court concluded, "[t]he undisputed facts established there was no relationship between [the borrower] and [the lender] giving rise to a duty the breach of which would permit [the borrower] to recover emotional distress damages based on negligence." (*Id.* at p. 208.)

Some federal district courts in California have concluded a lender owes no duty of care to a borrower to modify a loan. In *Armstrong v. Chevy Chase Bank, FSB* (N.D.Cal., Oct. 3, 2012, No. 5:11-cv-05664 EJD) 2012 U.S.Dist. Lexis 144125, pp. *11-*12, the court explained: "[A] loan modification, which at its core is an attempt by a money lender to salvage a troubled loan, is nothing more than a renegotiation of loan terms. This renegotiation is the same activity that occurred when the loan was first originated; the only difference being that the loan is already in existence. Outside of actually lending money, it is undebatable that negotiating the terms of the lending relationship is one of the key functions of a money lender. For this reason, '[n]umerous cases have characterized a loan modification as a traditional money lending activity.'" (See *Diunugala v. JP Morgan Chase Bank, N.A.* (S.D.Cal., Oct. 3, 2013, No. 12cv2106-WQH-NLS) 2013 U.S.Dist. Lexis 144326, p. *10 ["Absent special circumstances, there is no duty for a servicer to modify a loan"]; *Sanguinetti v. CitiMortgage, Inc.* (N.D.Cal., Sept. 11, 2013, No. 12-5424 SC) 2013 U.S.Dist. Lexis 130129, p. *17 ["Loan modifications are part of the lending process, and negotiating a lending agreement's terms is one of a bank's key functions"]; *Bunce v. Ocwen Loan Servicing, LLC* (E.D.Cal., July 17, 2013, No. CIV. 2:13-00976 WBS EFB) 2013 U.S.Dist. Lexis 100111, p. *15, [agreeing with *Armstrong v. Chevy Chase Bank, FSB* that lender does not owe duty in loan modification activities]; *Kennedy v. Bank of America, N.A.* (N.D.Cal., Apr. 26, 2012, No. 12-CV-952 YGR) 2012 U.S.Dist. Lexis 58636, pp. *21-*22 [lender owes borrower no duty of care in process of approving loan

modification]; *Dooms v. Federal Home Loan Mortgage Corp.* (E.D.Cal., Mar. 31, 2011, No. CV F 11-0352 LJO DLB) 2011 U.S.Dist. Lexis 38550, p. *28 ["The [lender] owed no duty of care to [the borrower] arising from her default, property foreclosure, and loan modification attempts"]; *DeLeon v. Wells Fargo Bank, N.A.* (N.D.Cal., Oct. 22, 2010, No. 10-CV-01390-LHK) 2010 U.S.Dist. Lexis 112941, p. *12 [the defendant lender did not have a duty "to complete the loan modification process"].)

Other United States District Courts have concluded a lender might owe a borrower a duty of care in negotiating or processing an application for a loan modification. (See *Ansanelli v. JP Morgan Chase Bank, N.A.* (N.D.Cal., Mar. 28, 2011, No. C 10-03892 WHA) 2011 U.S.Dist. Lexis 32350, pp. *21-*22 [allegation that lender offered plaintiffs a loan modification and "engage[d] with them concerning the trial period plan" was sufficient to create duty of care]; *Becker v. Wells Fargo Bank, N.A., Inc.* (E.D.Cal., Nov. 30, 2012, No. 2:10-cv-02799 LKK KJN PS) 2012 U.S.Dist. Lexis 170729, pp. *34-*35 [complaint stated claim against lender for negligence during the loan modification process]; *Crilley v. Bank of America, N.A.* (D. Hawaii, Apr. 26, 2012, No. 12-00081 LEK-BMK) 2012 U.S.Dist. Lexis 58469, p. *29 [denying motion to dismiss because plaintiffs "have pled sufficient facts to support a finding that Defendant went beyond its conventional role as a loan servicer by soliciting Plaintiffs to apply for a loan modification and by engaging with them for several months" regarding the modification]; *Garcia v. Ocwen Loan Servicing, LLC* (N.D.Cal., May 10, 2010, No. C 10-0290 PVT) 2010 U.S.Dist. Lexis 45375, pp. *7-*11 [plaintiff's allegations of lender's conduct in handling application for loan modification pleaded a duty of care].)

After oral argument, we invited the parties to submit supplemental briefs on three recent opinions, including *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 (*Jolley*), which addressed whether a construction lender owed a duty of care to the borrower. In *Jolley*, the plaintiff and Washington Mutual Bank (WaMu) entered into a construction loan agreement by which the plaintiff borrowed $2,156,000 to

15

renovate a house for use as rental property. (*Id.* at pp. 877, 878.) Problems arose due to WaMu's alleged failure to properly disburse loan proceeds, and WaMu agreed to modify the loan based on an expansion of the construction project. (*Id*. at p. 878.) Several months after the last disbursement, WaMu was closed by the Office of Thrift Supervision and placed in receivership under the Federal Deposit Insurance Corporation. (*Id.* at p. 879.) Certain of WaMu's assets, including the construction loan, were acquired by the defendant bank. (*Ibid.*)

Soon thereafter, the plaintiff ceased making payments on the loan, claiming he had been forced to default by WaMu's breaches and negligence in the funding of the construction loan. (*Jolley*, *supra*, 213 Cal.App.4th at p. 880.) The plaintiff tried to obtain a loan modification from the defendant and was told "there was a 'high probability'" the defendant would modify the loan to avoid foreclosure and it was likely the construction loan could be rolled over into a fully amortized conventional loan. (*Id.* at pp. 880-881.) So assured, the plaintiff completed construction by borrowing money from family and friends. (*Id.* at p. 881.) Instead of offering a loan modification, the defendant demanded payment of the loan in full and refused the plaintiff's request to postpone the planned foreclosure sale. (*Ibid.*)

The plaintiff sued the defendant for various causes of action, including negligence, fraud, breach of contract, and promissory estoppel. (*Jolley*, *supra*, 213 Cal.App.4th at p. 881.) The trial court granted summary judgment, and the Court of Appeal reversed. (*Id.* at pp. 877-878.) On the negligence cause of action, the Court of Appeal recognized the general rule that a financial institution does not owe a duty of care to a borrower when the institution acts within its traditional role as a lender of money. (*Id.* at p. 898.) The Court of Appeal concluded, however, the general rule did not apply to the facts of the case. The court explained: "When considered in full context, the cases show the question is not subject to black-and-white analysis—and not easily decided on the 'general rule.' We conclude here, where there was an ongoing dispute about WaMu's

performance of the construction loan contract, where that dispute appears to have bridged the [Federal Deposit Insurance Corporation]'s receivership and Chase's acquisition of the construction loan, and where specific representations were made by a Chase representative as to the likelihood of a loan modification, a cause of action for negligence has been stated that cannot be properly resolved based on lack of duty alone." (*Ibid.*)

The Court of Appeal did not end its analysis there. The court next considered the six factors identified in *Biakanja*, *supra*, 49 Cal.2d 647, for determining whether to impose a duty of care. (*Jolley*, *supra*, 213 Cal.App.4th at pp. 899-901.) The court assessed those factors and concluded they compelled the conclusion the defendant owed the plaintiff a duty to review his request for a loan modification in good faith. (*Id.* pp. 899-901.)

The *Jolley* court acknowledged it was dealing with a construction loan, not a residential home loan "where, save for possible loan servicing issues, the relationship ends when the loan is funded." (*Jolley*, *supra*, 213 Cal.App.4th at p. 901.) "By contrast, in a construction loan the relationship between lender and borrower is ongoing, in the sense that the parties are working together over a period of time, with disbursements made throughout the construction period, depending upon the state of progress towards completion. We see no reason why a negligent failure to fund a construction loan, or negligent delays in doing so, would not be subject to the same standard of care." (*Ibid.*, fn. omitted.) Despite limiting its holding to construction loans, the *Jolley* court went to great lengths, in dictum, to explain the "no-duty rule is only a general rule" and to suggest that a lender may be liable for negligence in its handling of a loan transaction within its traditional role as a lender of money. (*Id.* at pp. 901-902, citing *Ottolini v. Bank of America* (N.D.Cal., Aug. 19, 2011, No. C-11-0477 EMC) 2011 U.S.Dist. Lexis 92900, pp. *16-*17.)

The *Jolley* court reviewed recent federal and state legislation directed at aiding resident homeowners at risk of losing their homes through foreclosure, and

17

concluded that, while the new legislation did not directly apply to construction loans, it "sets forth policy considerations that should affect the assessment whether a duty of care was owed to [the plaintiff] at that time." (*Jolley*, *supra*, 213 Cal.App.4th at p. 905.) If the new legislation supports imposition of a duty of care on a construction lender, then it would support imposition of such a duty of care on a lender of home loans.

We disagree with *Jolley* to the extent it suggests a residential lender owes a common law duty of care to offer, consider, or approve a loan modification, or to explore and offer foreclosure alternatives. As the *Jolley* court recognized, "there is no express duty on a lender's part to grant a modification under state or federal loan modification statutes." (*Jolley*, *supra*, 213 Cal.App.4th at p. 903.) In *Aspiras v. Wells Fargo Bank, N.A.* (2013) 219 Cal.App.4th 948, 952, 963-964, the court distinguished *Jolley* and declined to impose a duty of care on an institutional lender in handling a loan modification. The *Aspiras* court agreed with the federal district courts that had held, "'offering loan modifications is sufficiently entwined with money lending so as to be considered within the scope of typical money lending activities.'" (*Aspiras v. Wells Fargo Bank, N.A.*, *supra*, at p. 964.)

We conclude a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money. A lender's obligations to offer, consider, or approve loan modifications and to explore foreclosure alternatives are created solely by the loan documents, statutes, regulations, and relevant directives and announcements from the United States Department of the Treasury, Fannie Mae, and other governmental or quasi-governmental agencies. The *Biakanja* factors do not support imposition of a common law duty to offer or approve a loan modification. If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct. If the lender did

18

not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct.

B. *Why the Allegations of the First Amended Complaint Do Not State a Cause of Action for Negligence*

Accordingly, in this case, Bank of America and ReconTrust did not have a common law duty of care to offer, consider, or approve a loan modification, or to offer Lueras alternatives to foreclosure. Likewise, Bank of America and ReconTrust did not have a duty of care to handle Lueras's loan "in such a way to prevent foreclosure and forfeiture of his property." Their rights, duties, and obligations in those regards were set forth in the note and deed of trust, the Forbearance Agreement, federal and state statutes and regulations, and the directives and announcements of the United States Department of the Treasury and Fannie Mae. (Cf. *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1154 ["'Because of the exhaustive nature of [the nonjudicial foreclosure] scheme, California appellate courts have refused to read any additional requirements into the non-judicial foreclosure statute'"].)

Lueras did not allege Bank of America and ReconTrust did anything wrongful that made him unable to make the original monthly loan payments. Lueras did not allege Bank of America and ReconTrust caused or exacerbated his initial default by negligently servicing the loan. To the contrary, he alleged his inability to make the payments was caused by financial hardship due to the "drastically decreased . . . demand of his services of his contracting business" and his wife's loss of employment. Lueras's allegations that Bank of America and ReconTrust owed him duties to "follow through on their own agreements," to comply with consumer protection laws, and to stop foreclosure sales that were unlawful fail to state a cause of action for negligence because such duties, if any, are imposed by the loan documents and the Forbearance Agreement, statutes, or regulations. If Bank of America and ReconTrust failed to "follow through" on those agreements, then Lueras's remedy lies in breach of contract, not negligence.

19

Thus, the First Amended Complaint did not, and cannot as a matter of law, state a claim for negligence based on Bank of America's alleged failure to offer Lueras a loan modification.

## C. *Basis for Granting Leave to Amend*

We conclude, however, that a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale. The law imposes a duty not to make negligent misrepresentations of fact. (Civ. Code, § 1710, subd. 2 [defining "deceit" to include "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true"]; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 172-174.) In a different context, courts have held a bank depositor can state a claim for negligent misrepresentation, based on a bank employee's incorrect statements about the settlement of a check. (*Wells Fargo Bank, N.A. v. FSI Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1572-1573; *Holcomb v. Wells Fargo Bank, N.A.* (2007) 155 Cal.App.4th 490, 498-500.) It is foreseeable that a borrower might be harmed by an inaccurate or untimely communication about a foreclosure sale or about the status of a loan modification application, and the connection between the misrepresentation and the injury suffered could be very close.[5]

Leave to amend must be granted if "there is a reasonable possibility that the defect can be cured by amendment." (*City of Dinuba v. County of Tulare*, *supra*, 41 Cal.4th at p. 865.) The First Amended Complaint generally alleged Bank of America failed to exercise "reasonable care and skill in timely and accurately responding to customer requests and inquiries." Based on the record before us and on the grounds we have explained in detail, it is reasonably possible that Lueras could amend the First Amended Complaint to state a cause of action for negligent misrepresentation. We

---

[5] Nothing we say is intended to alter the rights, obligations, and duties created by the Truth in Lending Act, 15 United States Code section 1601 et seq. or other statutes.

therefore reverse the judgment as to the negligence cause of action and remand to the trial court with directions to allow Lueras the opportunity to amend the First Amended Complaint to plead a cause of action for negligent misrepresentation.

## II.

## Breach of Contract

In the second cause of action of the First Amended Complaint, for breach of contract, Lueras asserted two theories: (1) Bank of America breached the deed of trust by failing to tender him the difference between the amount of the indebtedness and the auction price of his home at the foreclosure sale and (2) Bank of America breached the Forbearance Agreement.[6]

Bank of America argues the first theory is no longer viable because the foreclosure sale has been rescinded. As we have explained, in reviewing the judgment, we are limited to the well-pleaded facts of the complaint and matters subject to judicial notice. (*Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1126.) The First Amended Complaint did not allege rescission of the foreclosure sale, no party has requested we take judicial notice of anything establishing such rescission, and no party has argued that statements of Lueras's counsel constitute judicial admissions.

Under the second theory, Lueras alleged Bank of America breached the Forbearance Agreement "by terminating the 'Deferral Period' although the Servicer (i) never executed the Agreement, (ii) never offered another resolution of any default such as a modification, pre-foreclosure sale or deed in lieu of foreclosure, or (iii) found Mr. Lueras [in] default under the program."[7] In essence, Lueras alleged Bank of America

---

[6] ReconTrust was not named as a defendant in the breach of contract cause of action.

[7] Lueras also alleged: "Bank of America never [(1)] offered another resolution of Mr. Lueras'[s] default; (2) informed Mr. Lueras if he was approved or denied a loan modification as he requested at the end of the 6th month; (3) disclosed the amount his loan was in arrears on the 6th month when no other form of relief was forthcoming from Bank of America . . . ; and (4) by commencing or resuming the foreclosure process by

21

breached the Forbearance Agreement by failing to offer him a loan modification or some other resolution that would avoid foreclosure before commencing or resuming foreclosure of his home. Because the trial court sustained without leave to amend a demurrer to the breach of contract cause of action, we accept as true the allegations of the breach of contract cause of action and the exhibits attached to the First Amended Complaint. (*Sarale v. Pacific Gas & Electric Co.*, *supra*, 189 Cal.App.4th at p. 245.)

A. *Relevant Principles of Contract Interpretation*

The arguments presented require us to interpret parts of the Forbearance Agreement. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.) Civil Code section 1638 states, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (*Id.*, § 1641.) "To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027.)

---

filing a Notice of Default and setting an auction date without providing the HomeSaver resolution Bank of America was required to identify and provide."

B.  *Whether the Forbearance Agreement Was Binding*

In a footnote in the respondents' brief, Bank of America states it "does not concede that the forbearance agreement constituted a binding contract, since Lueras admitted that Bank of America did not execute the agreement."  We may decline to address arguments made perfunctorily and exclusively in a footnote.  (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [reviewing court may disregard claims perfunctorily asserted without development and without a clear indication they are intended to be discrete contentions]; *Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

We nonetheless reject this argument on the merits for two reasons.  First, Bank of America accepted payments during the deferral period and was entitled to receive a $200 incentive fee "upon successful reporting to Fannie Mae of the initiation of a HomeSaver Forbearance plan and the collection of one payment under the forbearance plan."  (Announcement 09-05R, *supra*, at p. 32 <https://www.fanniemae.com/content/announcement/0905.pdf> [as of Oct. 31, 2013].)  Under those circumstances, Bank of America's failure to sign the Forbearance Agreement did not render it unenforceable.  (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1012-1013 [lender's failure to sign and return loan modification contract was not a condition precedent precluding formation of a binding contract].)

Second, while a forbearance agreement that modifies a note and deed of trust is subject to the statute of frauds (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 552-554), here, in contrast, the Forbearance Agreement states:  "**No Modification.  I understand that the Agreement is not a forgiveness of payments on my Loan or a modification of the Loan Documents.**"  (Original boldface.)  The statute of frauds was not raised in the demurrer to the First Amended Complaint.

23

Lueras argues the deferral period under the Forbearance Agreement has not ended and Bank of America continues to have an obligation under the Forbearance Agreement to suspend foreclosure and offer him assistance. The Forbearance Agreement states the deferral period, under which Lueras made reduced payments on the note, commences "on the date of this Agreement" and ends on the earliest of (1) six months from "the execution date by Servicer," (2) "execution of an agreement with Servicer for another resolution of my default," or (3) "my default under the terms of this Agreement." According to Lueras, none of these events has occurred. Since Bank of America never signed the agreement, Lueras argues that six months from the execution date has not elapsed.

We reject the argument the deferral period under the Forbearance Agreement has not ended. Section 2 of the Forbearance Agreement sets forth a table showing the amount and due dates for six "Deferral Period Payment[s]," with the first payment due on September 16, 2009, and the final payment due on March 1, 2010. Following this table, the Forbearance Agreement sets forth the provision regarding the beginning and ending of the "Deferral Period." Other than the six payments set forth in the table, the Forbearance Agreement identifies no other deferral period payments.[8] Since the Forbearance Agreement was not to be binding until signed by Bank of America, and the first deferral period payment was due on September 16, 2009, a reasonable inference is the parties anticipated and intended that Bank of America would sign the Forbearance Agreement by that date. Viewing section 2 of the Forbearance Agreement in light of the agreement as a whole, we conclude the parties intended the deferral period to end no later than six months from the due date of the first deferral period payment.

---

[8] The letter from Bank of America notifying Lueras he was eligible for the HomeSaver Forbearance program stated, "[y]ou are eligible for a reduced mortgage payment for *up to six months*." (Boldface omitted, italics added.)

C. *Bank of America's Obligations Under the Forbearance Agreement*

    1. *The Forbearance Agreement and Announcement 09-05R*

        Lueras's breach of contract cause of action is based primarily on section 2.C of the Forbearance Agreement, labeled "Additional Assistance" (boldface omitted). The first sentence of section 2.C states that "[d]uring the Deferral Period, Servicer[9] will review my Loan to determine whether additional default resolution assistance can be offered to me." Section 2.C of the Forbearance Agreement then states that, at the end of the deferral period, one of five things will happen: (1) the borrower will be required to resume making regularly scheduled payments and to make additional payments until all past due amounts have been paid; (2) the loan will be reinstated in full; (3) the "Servicer will offer to modify my Loan"; (4) the "Servicer will offer me some other form of payment assistance or alternative to foreclosure, on terms to be determined solely by Servicer"; or (5) "if no feasible alternative can be identified, Servicer may commence or continue foreclosure proceedings or exercise other rights and remedies provided Servicer under the Loan Documents."

        Section 2.C, on its face, thus expressly required Bank of America to "review" Lueras's loan to determine "whether additional default resolution assistance can be offered." The Forbearance Agreement did not expressly require Bank of America to offer Lueras a loan modification or an alternative to foreclosure.

        However, in 2009, Announcement 09-05R was issued to provide "additional policy clarification and instruction" on HAMP and the HomeSaver Forbearance program. (Announcement 09-05R, *supra*, at p. 1 <https://www.fanniemae.com/content/announcement/0905.pdf> [as of Oct. 31, 2013].) As to the HomeSaver Forbearance program, Announcement 09-05R states: "During the six month period of forbearance, the servicer *should work* with the borrower to identify the

---

[9] Defined in the Forbearance Agreement as BAC Home Loans Servicing, LP, "the subsidiary of Bank of America that services your mortgage."

feasibility of, and implement, a more permanent foreclosure prevention alternative.  The servicer *should evaluate and identify* a permanent solution during the first three months of the forbearance period and *should implement* the alternative by the end of the sixth month."  (Announcement 09-05R, *supra*, at p. 32, italics added.)

We conclude these provisions of Announcement 09-05R must be read into HomeSaver Forbearance agreements.  *West*, *supra*, 214 Cal.App.4th 780, is instructive.  In *West*, a panel of this court addressed whether a residential borrower stated a cause of action against a residential lender for breach of a trial period plan (TPP) under HAMP.  (*West*, *supra*, at pp. 796-799.)  The borrower alleged the lender had breached the TPP by failing to offer her a permanent loan modification after she had complied with all of the terms of the TPP.  (*Ibid.*)  The United States Department of the Treasury, HAMP supplemental directive 09-01 (Apr. 6. 2009) provides that if the borrower complies with all of the TPP's terms and conditions, the loan modification becomes effective on the first day of the month following the trial period.  (*West*, *supra*, at p. 797.)  Following *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547 (*Wigod*), a panel of this court held that if the borrower complies with all of the terms of the TPP, then the lender must offer the borrower a permanent loan modification.  (*West*, *supra*, at pp. 796-799.)  Although the TPP in *West*, unlike the one in *Wigod*, did not expressly include such a proviso, this court concluded it was imposed by the United States Department of the Treasury through HAMP supplemental directive 09-01.  (*West*, *supra*, at p. 797.)  To make the TPP lawful and enforceable, it had to be interpreted to include the requirements of that directive.  (*Id.* at pp. 797-798.)

In *Corvello v. Wells Fargo Bank, NA* (9th Cir. 2013) 728 F.3d 878, __ [2013 U.S.App. Lexis 16415, pages *15-*16], the Ninth Circuit Court of Appeals expressly agreed with *Wigod* and *West* to conclude:  "Where, as here, borrowers allege, and we must assume, that they have fulfilled all of their obligations under the TPP, and the loan servicer has failed to offer a permanent modification, the borrowers have valid

26

claims for breach of the TPP agreement." (See *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1059 [following *Corvello v. Wells Fargo Bank, NA*].) Even more recently, the Third District Court of Appeal also agreed with *West* and *Wigod*. (*Bushell v. JPMorgan Chase Bank, N.A.* (Oct. 22, 2013, C070643) __ Cal.App.4th. __ [2013 Cal.App. Lexis 841].)

*West* dealt with a TPP under HAMP, and this case deals with a forbearance agreement under the HomeSaver Forbearance program. For that reason, Bank of America argues in its supplemental brief that *West* is inapplicable. While HAMP and the HomeSaver Forbearance program differ, the guiding principle of *West*—i.e., that a TPP under HAMP must be interpreted to include United States Department of the Treasury directives—is applicable here. Announcement 09-05R is similar to United States Department of the Treasury, HAMP supplemental directive 09-01 and sets forth "policy clarification and instruction" regarding the HomeSaver Forbearance program. (Announcement 09-05R, *supra*, at p. 1 <https://www.fanniemae.com/content/ announcement/0905.pdf> [as of Oct. 31, 2013].) Bank of America does not assert it was not required to follow Announcement 09-05R. Thus, "the reasonable interpretation of the [Forbearance] Agreement—and the one necessary to make it lawful and in compliance with [the HomeSaver Forbearance program]" is that the Forbearance Agreement includes the obligations imposed by Announcement 09-05R. (*West*, *supra*, 214 Cal.App.4th at p. 798.)

2. *The Meaning of "Should" in Announcement 09-05R*

As quoted above, Announcement 09-05R states the lender "*should work with the borrower*" to identify and implement a permanent foreclosure prevention alternative, "*should evaluate and identify*" a permanent loan solution, and "*should implement*" the alternative by the end of the six-month deferral period. (Announcement 09-05R, *supra*, at p. 32, italics added <https://www.fanniemae.com/ content/announcement/0905.pdf> [as of Oct. 31, 2013].) Bank of America argues the

27

word "should" is permissive rather than mandatory and, therefore, Announcement 09-05R imposed *no* obligation on them to offer a loan modification or other alternative to foreclosure. In his supplemental brief, Lueras argues the word "should" must be interpreted to mean Bank of America "was obligated to evaluate and identify a permanent solution."

What does "should" in this context mean? We start by consulting the dictionary.[10] According to Webster's Third New International Dictionary, "should" in auxiliary function can be used (1) "to express condition"; (2) "to express duty, obligation, necessity, propriety, or expediency"; (3) "to express futurity from a point of view in the past"; (4) in place of "might" or "could" (capitalization omitted) (archaic); (5) "to express what is probable or expected"; or (6) "to express a desire or request in a polite or unemphatic manner." (Webster's 3d New Internat. Dict. (2002) p. 2104, cols. 2-3.) Black's Law Dictionary defines "should" to mean: "[T]he past tense of 'shall,' which ordinarily implies a command, but 'should' used in the present or future tense, while not synonymous with and more forceful than 'may,' can convey only a moral obligation or strong recommendation." (*Boam v. Trident Financial Corp.* (1992) 6 Cal.App.4th 738, 745, fn. 6, citing Black's Law Dict. (6th ed. 1990) p. 1379.)

The California Rules of Court distinguish between the words "must," "may," "may not," "will," and "should." (Cal. Rules of Court, rule 1.5(b).) Under the California Rules of Court, "'[s]hould'" expresses a preference or a nonbinding recommendation," while "'[m]ust' is mandatory," "'[m]ay' is permissive," and "'[w]ill' expresses a future contingency." (*Id.*, rule 1.5(b)(1), (2), (4) & (5).) Case law has defined "should" generally to mean a moral obligation or recommendation. (See *Kucera v. Lizza* (1997) 59 Cal.App.4th 1141, 1152 ["The words 'may' and 'should' are ordinarily permissive"]; *Boam v. Trident Financial Corp.*, *supra*, 6 Cal.App.4th at p. 745, fn. 6;

---

[10] A court may refer to dictionaries as sources of a word's ordinary, usual meaning. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.)

*Cuevas v. Superior Court* (1976) 58 Cal.App.3d 406, 409 [in Penal Code section 1538.5, subdivision (b), "[t]he word 'should' is used in a regular, persuasive sense, as a recommendation, not as a mandate"].)

We agree with Bank of America the word "should" in Announcement 09-05R is not mandatory; however, we reject the notion the word "should" in that announcement is entirely permissive and imposes no responsibilities or obligations whatsoever on loan servicers. Under the variety of definitions offered, "should" in the very least imposes a moral obligation or a strong recommendation, and can mean a duty or necessity. Interpreting "should" as imposing some obligation on the loan servicer is in keeping with the purpose of Announcement 09-05R, which was issued to provide policy clarification and instruction to loan servicers for implementation of the HomeSaver Forbearance program. The sense of moral obligation, strong recommendation, preference, or propriety imparted by the word "should" equates with good faith; that is, although Bank of America had no contractual duty to offer Lueras a loan modification or an alternative to foreclosure, it had a contractual duty to work with him to identify the feasibility of, and implement, a foreclosure prevention alternative, and to do so in good faith.

The duty to act in good faith in working with a borrower is imposed expressly in the Forbearance Agreement through Announcement 09-05R and by the implied covenant of good faith and fair dealing. Every contract imposes on each party a duty of good faith and fair dealing in contract performance and enforcement such that neither party may do anything to deprive the other party of the benefits of the contract. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371; *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500; *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.) "'This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his

29

own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose.'" (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 798, p. 892.)

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, *supra*, 2 Cal.4th at p. 372.) Accordingly, while the word "should" as used in Announcement 09-05R gives a loan servicer discretion to work with a borrower to identify the feasibility of a foreclosure prevention alternative, and to evaluate and implement a permanent solution, that discretionary power must be exercised in good faith.

As it stands, the First Amended Complaint alleged Bank of America "never offered another resolution of any default such as a modification, pre-foreclosure sale or deed in lieu of foreclosure." Although the Forbearance Agreement did not impose on Bank of America the obligation to offer Lueras a loan modification or an alternative to foreclosure, we conclude Lueras should be given leave to amend to state a claim for breach of contract in light of our interpretation of the Forbearance Agreement.

D. *Damages*

Bank of America argues Lueras failed to allege damages from breach of the Forbearance Agreement. In the First Amended Complaint, Lueras alleged that, as a result of Bank of America's breach of contract, he sustained damages of at least $25,000, "representing moni[e]s collected by Defendants during the 'special forbearance' time period and on the sale plus the amount of late fees and charges incurred on the loan as a result of Defendants' breach." The payments made by Lueras during the deferral period do not constitute contractual damages because they would have been owed under the note and deed of trust in absence of the Forbearance Agreement.

30

In this opinion, the rights and obligations under the Forbearance Agreement are being identified and described in a definitive way for the first time. Lueras has not had the opportunity to formulate and allege a theory of damages based on our construction of the Forbearance Agreement. We certainly cannot say at this stage that Lueras is unable as a matter of law to allege breach of contract damages. As there is "a reasonable possibility" (*City of Dinuba v. County of Tulare*, *supra*, 41 Cal.4th at p. 865) that Lueras could amend to allege recoverable damages, leave to amend must be granted.

## III.

### Violation of Civil Code Section 2923.5

In his third cause of action of the First Amended Complaint, Lueras alleged Bank of America and ReconTrust violated Civil Code section 2923.5 because they "did not initiate exploration of foreclosure alternatives with [him] until after a Notice of Default was recorded on the property placing [him] in imminent foreclosure." In *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 213-214, this court held: "Civil Code section 2923.5 requires, before a notice of default may be filed, that a lender contact the borrower in person or by phone to 'assess' the borrower's financial situation and 'explore' options to prevent foreclosure." The only remedy afforded by section 2923.5 is, however, a one-time postponement of the foreclosure sale before it happens. (*Mabry v. Superior Court*, *supra*, at pp. 214, 225, 235.)

The First Amended Complaint did not seek postponement of the foreclosure sale and alleged the sale had been conducted. The third cause of action therefore did not state and cannot as a matter of law state a claim for violation of Civil Code section 2923.5.

## IV.

### Fraud/Misrepresentation

In the fourth cause of action of the First Amended Complaint, Lueras alleged Bank of America committed fraud and "led [him] to believe that [his] home

31

would not be sold in May 2011 and that it wanted to help [him] maintain ownership of [his] home." The elements of fraud are (1) the defendant made a false representation as to a past or existing material fact; (2) the defendant knew the representation was false at the time it was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

The First Amended Complaint alleged Bank of America made the following false representations:

1. "Bank of America represented it wanted to help plaintiffs maintain ownership of their home through the language of the [Forbearance A]greement which states 'Under the HomeSaver Forbearance program, we are working with Fannie Mae, a government sponsored enterprise, to reduce your mortgage payment by up to 50% for up to 6 months while we work with you to find a long-term solution. This is not a permanent payment reduction, but it will allow you to stay in your home as we work together to find a solution.'"

2. "The [Forbearance] Agreement reinforced the representation that Bank of America and Fannie Mae would work with Mr. Lueras to find 'a long term solution' on the second page where it stated the Deferral Period would continue until 'execution of an agreement with Servicer for another resolution of my default . . . .'"

3. "Bank of America led plaintiff to believe that defendants were going to work with [him] so [he] could stay in [his] home so long as [he] made the requested payments."

4. "[O]n May 5, 2011[,] Bank of America sent another letter stating it would contact Mr. Lueras in 10 days to explore alternatives to foreclosure."

5. "Bank of America concealed the fact that it was not going to identify a long term solution in order to 'save' Mr. Lueras'[s] home from foreclosure."

32

The First Amended Complaint did not allege any misrepresentations attributed to Fannie Mae.

The First Amended Complaint alleged Lueras was led to believe "a long-term solution to keep [him] in [his] home was being worked on" and that his "home would not be sold in May 2011." The First Amended Complaint alleged Lueras did the following in reliance on the alleged misrepresentations:

1. Lueras "continued to make the payments" on the loan.

2. He "[took] the time and t[ook] on the extra burden and expense of compiling and providing the information requested [in] which [he] had a right to privacy" and he "would not have spent [his] valuable money, time and efforts in attempting to modify [his] loan with Bank of America prior to default, if [he] had known that [he] would not have had a genuine opportunity to modify."

These allegations do not allege detrimental reliance. Continuing to make payments on the loan (reduced under the Forbearance Agreement) does not constitute detrimental reliance because Lueras already had the obligation to make those payments. In *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172, the plaintiffs asserted that a bank's promise to engage in good faith negotiations to modify a loan caused the plaintiffs to continue making payments on a note secured by undervalued property. The court rejected that theory because the plaintiffs had a contractual obligation to make payments on the note, notwithstanding the bank's promise to renegotiate its terms. (*Id.* at pp. 1185-1187.)

Time and effort spent assembling materials for an application to modify a loan is the sort of nominal damage subject to the maxim de minimis non curat lex—i.e., the law does not concern itself with trifles. (Black's Law Dict. (9th ed. 2009) p. 496, col. 2; see Civ. Code, § 3533 ["The law disregards trifles"]; *Merrill v. Hurlburt* (1883) 63 Cal. 494, 497 ["Considering the amount involved in the action we cannot say we ought to affirm the judgment upon the maxim *de minimis,* etc."]; *McAllister v. Clement* (1888) 75

33

Cal. 182, 184 [nominal damages not recoverable under maxim de minimis non curat lex]; *Wolff v. Prosser* (1887) 73 Cal. 219, 220 [maxim de minimis non curat lex applies to damages of $10]; *Harris v. Time, Inc.* (1887) 191 Cal.App.3d 449, 458 ["the present action is 'de minimis' in the extreme"].)

Nevertheless, the exhibits attached to the First Amended Complaint— including the Forbearance Agreement, the May 5, 2011 letter, and the May 6, 2011 letter—demonstrate there is a reasonable possibility the defects in the fraud cause of action can be cured by amendment. In the May 5, 2011 letter, Bank of America informed Lueras any pending foreclosure sale would be "on hold" while he was being considered for other foreclosure avoidance programs. Whitaker, a Bank of America representative, told him the May 5 letter was sent in error and he had been approved for a loan modification. In the May 6, 2011 letter, Bank of America informed Lueras it was reviewing his financial documents to determine whether he was eligible for a HAMP loan modification. When Lueras contacted Bank of America about the May 6 letter, Whitaker told him the trustee's sale, which had been rescheduled for May 18, 2011, would be reset, pending approval by Fannie Mae of his loan modification. Despite the express representation in the May 5 letter that no foreclosure sale would proceed, and Whittaker's oral representation that the sale would be reset, the foreclosure sale was conducted on May 18.[11]

As explained above, Bank of America argues the trustee's sale conducted on May 18, 2011 was rescinded, and, therefore, Lueras suffered no damages. Even if we

_____

[11] *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481 is distinguishable and does not change our conclusion that Lueras should have leave to amend the fraud cause of action. The First Amended Complaint, including the attached exhibits, alleged that Bank of America misrepresented not only that it had approved a loan modification, but also that the pending foreclosure sale had been postponed. We cannot say as a matter of law that Lueras suffered no damages as a result of such misrepresentations. Unlike the situation in *Rossberg*, here, more than "'an abstract right to amend'" (*Rossberg v. Bank of America, N.A.*, *supra*, at p. 1504) has been shown.

34

were to assume the trustee's sale was rescinded, we could not say as a matter of law that Lueras suffered no damages as a result of Bank of America's actions.

## V.

## Unfair and Unlawful Practices

In the fifth cause of action of the First Amended Complaint, Lueras alleged Bank of America engaged in "deceptive business practices" in violation of California's unfair competition law (UCL), Business and Professions Code section 17200 et seq. He alleged Bank of America engaged in deceptive practices "with respect to mortgage loan servicing, foreclosure of residential properties and related matters" in violation of the UCL.

Bank of America argues Lueras failed to allege it engaged in any unlawful, unfair, or fraudulent practices. Bank of America also argues the trial court was correct in concluding Lueras lacked standing to sue under Business and Professions Code section 17204 (section 17204).

A. *The UCL*

The UCL permits civil recovery for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) "'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. . . .'" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

By defining "unfair competition" to include any unlawful act or practice, the UCL permits violations of other laws to be treated as independently actionable as unfair competition. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, *supra*, 20 Cal.4th at p. 180.) "'[A]n "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]'

35

[Citation.]" (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 719.) An unfair business practice also means "'the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.'" (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940.) A fraudulent practice under the UCL "require[s] only a showing that members of the public are likely to be deceived" and "can be shown even without allegations of actual deception, reasonable reliance and damage." (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838.)

B. *Standing*

Before addressing Lueras's specific allegation of unlawful, unfair, or fraudulent practices, we address the threshold issue whether Lueras has alleged standing to assert a UCL claim. To have standing to sue under the UCL, a private plaintiff must allege he or she "has suffered injury in fact and has lost money or property." (§ 17204.) In *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset*), the California Supreme Court held that to satisfy the standing requirement of section 17204, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by* the unfair business practice or false advertising that is the gravamen of the claim." A UCL claim will survive a demurrer based on standing if the plaintiff can plead "'general factual allegations of injury resulting from the defendant's conduct.'" (*Kwikset*, *supra*, at p. 327.)

The *Kwikset* court held a plaintiff can satisfy the economic injury prong of the standing requirement in "innumerable ways" but listed four injuries that would qualify under section 17204: (1) the plaintiff surrendered more or acquired less in a transaction than the plaintiff otherwise would have; (2) the plaintiff suffered the diminishment of a present or future property interest; (3) the plaintiff was deprived of money or property to which the plaintiff had a cognizable claim; or (4) the plaintiff was

required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. (*Kwikset*, *supra*, 51 Cal.4th at p. 323.)

Bank of America argues Lueras cannot allege the threshold standing requirement because he had been in default for years before suing and his monthly payment under the Forbearance Agreement was less than his monthly payment under the note and deed of trust.[12] The First Amended Complaint failed to allege that Lueras lost any out-of-pocket money as a result of Bank of America's acts of alleged deceptive practices, except for costs incurred in preparing and assembling materials for his application for a loan modification. We have deemed such costs to be de minimis, and they are not sufficient to qualify as injury in fact under section 17204.

But the allegation that Lueras's home was sold at a foreclosure sale is sufficient to satisfy the economic injury prong of the standing requirement of section 17204. (See *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 522.) (*Jenkins*) [allegation of impending foreclosure and loss of home satisfies economic injury requirement].) Sale of a home through a foreclosure sale is certainly a deprivation of property to which a plaintiff has a cognizable claim. (See *Kwikset*, *supra*, 51 Cal.4th at p. 323.) Lueras must also satisfy the "caused by" prong of the section 17204 standing requirement—i.e., show "plaintiff's economic injury [occurred] 'as a result of' the unfair competition." (*Kwikset*, *supra*, at p. 326.) The First Amended Complaint did not allege any such "'causal connection'" (*ibid.*) between Bank of America's allegedly unlawful, unfair, or fraudulent conduct and Lueras's economic injury.

---

[12] Bank of America also asserts that Lueras "conceded that Bank of America rescinded the May 2011 foreclosure sale." As we explained above, the First Amended Complaint did not allege rescission of the foreclosure sale, and no party has requested we take judicial notice of anything establishing such rescission. In reviewing the judgment, we are limited to the well-pleaded facts of the complaint and matters subject to judicial notice. (*Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1126.)

The question is whether Lueras should be granted leave to amend to try to satisfy the "caused by" prong. We believe there is a reasonable possibility that Lueras can cure the defect in the First Amended Complaint. As we explained in addressing the fraud cause of action, Bank of America informed Lueras any pending foreclosure sale would be "on hold" while he was being considered for other foreclosure avoidance programs. Whitaker of Bank of America told him the May 5, 2011 letter was sent in error and he had been approved for a loan modification. Lueras was told the foreclosure sale was to be rescheduled pending Fannie Mae's approval of his loan modification. Those allegations suggest Lueras can amend his UCL cause of action to allege Bank of America's misrepresentations caused him to lose his home through foreclosure. In addition, Lueras might be able to allege Bank of America did not work with him in good faith to evaluate and try to identify and implement a permanent solution, as a consequence of which he lost his home through foreclosure.

In *Jenkins*, *supra*, 216 Cal.App.4th at pages 519-521, the plaintiff alleged the defendants' unlawful, unfair, and fraudulent business practices caused her home to be subject to foreclosure. The Court of Appeal held the plaintiff failed to satisfy the "caused by" prong because she admitted in her complaint that she defaulted on her loan, thereby triggering the power of sale clause in the deed of trust that made her home subject to foreclosure. (*Id.* at pp. 522-523.) The court explained: "As [the plaintiff]'s home was subject to nonjudicial foreclosure because of [the plaintiff]'s default on her loan, which occurred before Defendants' alleged wrongful acts, [the plaintiff] cannot assert the impending foreclosure of her home (i.e., her alleged economic injury) was caused by Defendants' wrongful actions. Thus, even if we assume [the plaintiff]'s third cause of action alleges facts indicating Defendants' actions violated at least one of the UCL's three unfair competition prongs (unlawful, unfair, or fraudulent), [the plaintiff's complaint] cannot show any of the alleged violations have a causal link to her economic injury." (*Id.* at p. 523.)

This case is similar to *Jenkins* in that Lueras's default on the loan, not any conduct on the part of Bank of America, triggered foreclosure proceedings. *Jenkins* is distinguishable, however, because, in this case, Lueras might be able to allege that Bank of America's alleged misrepresentations about his loan modification and the status of the foreclosure sale, or Bank of America's failure to work with him in good faith to identify and to try to implement a permanent solution, caused him to lose his home through a foreclosure sale.

C. *Whether Lueras Alleged Unlawful, Unfair, or Fraudulent Practices*

  1. *Allegations of UCL Violations*

Since, we conclude, Lueras should be given leave to amend to allege standing, we address whether he has alleged in the First Amended Complaint unlawful, unfair, or fraudulent practice on the part of Bank of America. Lueras alleged Bank of America violated the UCL in these nine ways:

1. "Refusing to offer a 'resolution' of the default after leading [Lueras] to believe that the 'HomeSaver' agreement would lead to another agreement that would [c]ure the Arrearages (which they never disclosed in amount) . . . ."

2. "Selling the home at foreclosure within 30 days of receiving the written denial of modification in violation of the Making Home Affordable Guidelines."

3. "Failing to stop the foreclosure process when Fannie Mae and Bank of America agreed to permanently modify Mr. Lueras['s] loan in May 2011 in violation of federal regulations that prohibit dual tracking."

4. "Failing to explore foreclosure alternatives with Mr. Lueras prior to filing the Notice of Default in violation of Civ[il] Code §2923.5 and the HomeSaver plan guidelines . . . ."

5. "Inserting deceitful language in the forbearance plan using phrases such as 'HomeSaver' 'long term solution['] and 'resolution of my default' leading the public and . . . Lueras to believe that they were going to be offered some type of permanent

39

solution so that they could save their home if they signed the agreement, supplied the information requested and made all of the payments on time."

6. "Failing to make a determination or identify a permanent solution so that the public like . . . Lueras could save their home[s] by the third month of the plan in violation of the HomeSaver Guidelines quoted above in breach of industry standards set by 15 [United States Code section] 1639a."

7. "Falsely representing that . . . Lueras did not qualify for HAMP modification when, in fact . . . Lueras did qualify for a HAMP modification in breach of industry standards set by 15 [United States Code section] 1639a."

8. "Auctioning off the home for less than the amount owed, yet refusing to reduce the principal which would have resulted in a positive NPV [(net present value)] in breach of industry standards set by 15 [United States Code section] 1639a."

9. "Representing in the May 16, 2011[13] letter by Bank of America to Mr. Lueras that 'once we have finished reviewing your information, we will contact you within 10 days to let you know what other options are available to you and the next steps you need to take' then selling the home within 10 days at foreclosure auction without contacting Mr. Lueras and providing other options in breach of industry standards set by 15 [United States Code section] 1639a."

2. *Sufficiency of the Allegations of UCL Violations*

Numbers 1, 4, 5, 6, and 8 do not constitute unlawful, unfair, or fraudulent practices. As to numbers 1, 5, and 6, the Forbearance Agreement did not require Bank of America to offer Lueras a loan modification or other alternative to foreclosure. We find nothing in the Forbearance Agreement or the HomeSaver Forbearance program, which would mislead a borrower into believing "they were going to be offered some type of permanent solution" merely by signing the agreement and making the deferral period

---

13 The First Amended Complaint does not include this letter as an exhibit.

payments. Bank of America's August 2009 letter informed Lueras the bank was working with Fannie Mae to reduce his mortgage payment by up to 50 percent "for up to 6 months." The Forbearance Agreement explicitly stated that, at the end of the deferral period, Bank of America could resume foreclosure. The Forbearance Agreement explicitly stated, "I understand that the Agreement is not a forgiveness of payments on my Loan or a modification of the Loan Documents." (Boldface omitted.) Nothing in the Forbearance Agreement would mislead a borrower into believing Bank of America would always determine or identify a permanent solution to "save" the borrower's home.

Although the Forbearance Agreement did not require Bank of America to offer Lueras a loan modification, we concluded above that the Forbearance Agreement did impose on Bank of America the duty to act in good faith to evaluate and try to identify a permanent solution during the first three months of the forbearance period, and to implement an identified alternative by the end of the sixth month. In light of this interpretation of the Forbearance Agreement, Lueras should be given leave to amend his UCL cause of action.

As to number 4—failure to explore foreclosure alternatives—we concluded above that Lueras failed to state a cause of action for violation of Civil Code section 2923.5. Number 8—selling Lueras's home for less than the amount owed—does not state a UCL claim because Lueras alleged in the breach of contract cause of action that Bank of America sold his home for more than the amount of the indebtedness and failed to tender him the difference. The breach of contract allegations were incorporated into the UCL cause of action.

Numbers 2, 3, 7, and 9 do allege facts which, if true, would constitute fraudulent and/or unfair practices. It is fraudulent or unfair for a lender to proceed with foreclosure after informing a borrower he or she has been approved for a loan modification, or telling the borrower he or she will be contacted about other options and the borrower's home will not be foreclosed on in the meantime, as represented in the

41

May 5 letter. It is fraudulent or unfair for a lender to misrepresent the status or date of a foreclosure sale. In this case, Lueras alleged he contacted Bank of America about the May 6, 2011 letter, was informed he had already been approved for a loan modification, and was told the trustee's sale, which had been rescheduled for May 18, 2011, would be reset pending approval by Fannie Mae of the loan modification.

Bank of America argues that recent legislation (known as the "California Homeowner Bill of Rights") that prohibits the practice of "dual tracking" was not effective in 2011 and is not to be applied retroactively.[14] Lueras argues the California Homeowner Bill of Rights demonstrates that Bank of America's conduct, though not unlawful at the time, "was unfair and/or fraudulent." We do not address either argument because Lueras alleged that Bank of America engaged in conduct that amounted to fraudulent practices, independent of the California Homeowner Bill of Rights.

## VI.

### Quiet Title

In the sixth cause of action of the First Amended Complaint, Lueras sought to quiet title to the property and alleged, "[t]he claims of defendants are without any right whatever and such defendants have no right or interest in the Subject Property." A borrower may not, however, quiet title against a secured lender without first paying the

___

[14] On July 11, 2012, the Governor approved legislation known as the "California Homeowner Bill of Rights" (Sen. Bill No. 900 (2011-2012 Reg. Sess.); Assem. Bill No. 278 (2011-2012 Reg. Sess.)). (Governor Brown's signing message on Assem. Bill No. 278 (2011-2012 Reg. Sess.) July 11, 2012.) The California Homeowner Bill of Rights prohibits, among other things, "dual track" foreclosures, which occur when a servicer continues foreclosure proceedings while reviewing a homeowner's application for a loan modification; requires a single point of contact for homeowners who are negotiating a loan modification; and expands notice required to be given to the borrower before the lender can take action on a loan modification or pursue foreclosure. (Governor Brown's signing message; see Stats. 2012, ch. 86, §§ 1-25; Stats. 2012, ch. 87, §§ 1-25.) The California Homeowner Bill of Rights became effective on January 1, 2013. (Cal. Const., art. IV, § 8, subd. (c)(1) [effective date of new statutes is January 1, following 90 days after enactment].)

outstanding debt on which the mortgage or deed of trust is based.  (*Miller v. Provost* (1994) 26 Cal.App.4th 1703, 1707 ["mortgagor of real property cannot, without paying his debt, quiet his title against the mortgagee"]; *Aguilar v. Bocci* (1974) 39 Cal.App.3d 475, 477 [borrower cannot quiet title without discharging the debt].)  The cloud on title remains until the debt is paid.  (*Burns v. Hiatt* (1906) 149 Cal. 617, 620-622.)

Lueras does not challenge the validity of the underlying debt.  He alleged he refinanced his home for $385,000 in 2007 and he executed a deed of trust to secure the loan.  Instead, he argues tender of the indebtedness is not required to quiet title because (1) making payments under the Forbearance Agreement constituted a tender of the debt, and (2) tender would not have been required to halt or set aside a foreclosure sale.

As to the first argument, making the monthly payments required under the Forbearance Agreement would not constitute full payment of the outstanding loan.  As to the second argument, full tender of the indebtedness must be made to set aside a foreclosure sale based on irregularities in the foreclosure procedure.  (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 103-104.)  Full tender of the indebtedness is not required if the borrower attacks the validity of the underlying debt.  (*Id.* at pp. 112-113.) Lueras is not seeking to set aside the foreclosure sale, nor is he challenging the validity of the underlying debt.

In his supplemental brief, Lueras argues *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250 supports his contention that tender of the indebtedness was unnecessary to maintain the quiet title action.  In *Pfeifer*, the Court of Appeal held that the borrowers stated a claim for wrongful foreclosure and declaratory and injunctive relief, based on allegations the lenders failed to comply with certain face-to-face interview requirements imposed by the Federal Housing Administration deed of trust before conducting an otherwise valid nonjudicial foreclosure.  (*Id.* at p. 1255.) The face-to-face interview and other servicing requirements imposed by federal regulations were conditions precedent to acceleration of the debt and foreclosure.  (*Ibid.*)

43

The Court of Appeal concluded the borrowers were not required to tender the indebtedness before seeking to enjoin the foreclosure sale because "to permit a foreclosure when the lender has not complied with the requirements that may have prevented any need for a foreclosure would defeat a salient purpose of the . . . regulations." (*Id.* at p. 1280.) In addition, tender of the indebtedness is required only to set aside a completed sale, and is not required in an action to prevent a foreclosure sale. (*Ibid.*)

*Pfeifer v. Countrywide Home Loans, Inc.* and the other tender cases are inapplicable here because Lueras has not sued to set aside or prevent a foreclosure sale. In the sixth cause of action, he sought to quiet title to the property, which he cannot do without paying the outstanding indebtedness.

## DISPOSITION

The judgment in favor of Fannie Mae is affirmed. The judgment as to the causes of action for violation of Civil Code section 2923.5 and to quiet title is affirmed. In all other respects, the judgment in favor of Bank of America and ReconTrust is reversed and the matter is remanded to the trial court with directions to grant Lueras leave to file an amended complaint. Lueras shall recover costs incurred on appeal.

FYBEL, ACTING P. J.

I CONCUR:

IKOLA, J.

44

**THOMPSON, J.,** Concurring and Dissenting—I concur in those portions of the majority opinion which conclude the trial court correctly sustained the demurrers to the first amended complaint, because Lueras did not state any viable cause of action. I respectfully dissent from those portions of the majority opinion which conclude the trial court incorrectly denied leave to amend, because Lueras did not demonstrate a reasonable possibility he can state any viable cause of action. Therefore, the trial court did not abuse its discretion and the judgment should be affirmed in all respects.

## INTRODUCTION

There are three core areas of disagreement between my views and the views expressed by my colleagues in the majority opinion.

First, the majority refuses to acknowledge what the parties themselves do not dispute—there is no foreclosure upon which this wrongful foreclosure action can be based. Lueras admitted the trustee's sale was rescinded before the trustee's deed was recorded, and Lueras alleged he was never deprived of ownership or possession of his home. The trial court properly considered these facts when ruling on the demurrers and we are required to do the same when reviewing the propriety of those rulings. The consequence of the majority's refusal to do so is akin to allowing a wrongful death action to proceed when the alleged victim did not die.

Second, despite recognizing the long-standing rule that a residential lender does not owe any duty of care to a borrower, the majority stretches to create an exception, and concludes a residential lender does owe a duty of care to not make misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale. There is no such exception. Furthermore, the majority fails to analyze whether Lueras pleaded or demonstrated a reasonable possibility he can plead facts sufficient to establish the elements of a negligent misrepresentation cause of action against Bank of America. Lueras did not and cannot plead any such facts.

1

Third, the majority concedes the breach of contract cause of action is hopelessly deficient, but asserts the provisions of Fannie Mae Announcement 09-05R must be "read into" the forbearance agreement to circumvent those deficiencies. The majority cites no case which has followed this approach or found a borrower has a private contractual right to sue a lender for money damages based upon alleged noncompliance with Announcement 09-05R. Moreover, this approach violates basic principles of contract law and injects uncertainty into California residential lending.

**FACTS**

A. *Lueras's Factual Allegations*

The majority summarizes some of the factual allegations, and fails to note many of the glaring factual omissions in the verified first amended complaint. All of the factual allegations and omissions I find material are set out below. Of necessity there is some repetition, but only to keep everything in proper context.

Lueras owned the property (Property) and occupied it as his primary residence at all relevant times, through and including the date on which the first amended complaint was filed. Lueras did not allege he ever was deprived of ownership or possession of the Property.

In March 2007, Lueras refinanced the Property with a 30-year adjustable rate $385,000 loan (Loan) originated by Gateway Business Bank (Gateway). Gateway, a potentially indispensible party, was not named as a defendant in the first amended complaint and is not a party to this appeal.

The Loan was evidenced by a promissory note (Note) and secured by a deed of trust (Deed of Trust) which encumbered the Property. The Deed of Trust was attached to the first amended complaint.

Lueras did not allege Gateway subsequently retained or sold the Note and the beneficial interest under the Deed of Trust. Thus, the identity of the current lender under the Note and Deed of Trust (collectively Loan Documents) is uncertain.

2

Bank of America (as successor to Countrywide Home Loans Servicing) was the servicer of the Loan. Lueras did not allege Bank of America was a party to the Loan Documents.

Lueras did not allege Fannie Mae was a party to the Loan Documents. Moreover, Lueras did not allege the Loan was owned or insured by Fannie Mae.

Lueras's regular monthly payment on the Loan was $1,965.10. Lueras has not made a full regular monthly payment on the Loan since December 2008.

In August 2009, more than eight months after Lueras stopped making regular monthly payments on the Loan, Bank of America offered him a forbearance agreement (Forbearance Agreement) and Lueras accepted.

Fannie Mae is not a party to the Forbearance Agreement.

The Forbearance Agreement required Lueras to make reduced monthly payments on the Loan in the amount of $1,101.16 during the deferral period. Bank of America agreed to apply these reduced monthly payments to the delinquent full regular monthly payments on the Loan.

The Forbearance Agreement provides, "The Servicer will suspend any scheduled foreclosure sale, provided I continue to meet the [reduced monthly payment] obligations under this [Forbearance] Agreement."

The Forbearance Agreement also provides, "If this Agreement terminates, however, then any pending foreclosure action . . . may be immediately resumed from the point at which it was suspended, and no new notice . . . will be necessary to continue the foreclosure action, all rights to such notices being hereby waived . . . ."

Lueras agreed, "Upon termination of this [Forbearance] Agreement, if I have not entered into another agreement with Servicer to cure or otherwise resolve my default under the Loan Document [*sic*] or reinstated my Loan in full, the Servicer will have all of the rights and remedies provided by the Loan Documents . . . ."

3

Lueras acknowledged, "I further understand and agree that the Servicer is not obligated or bound to make any modification of the Loan Documents or provide any other alternative resolution of my default under the Loan Documents."

Lueras made reduced payments on the Loan during the six-month deferral period under the Forbearance Agreement beginning in September 2009 and ending in March 2010, and "beyond for four more months."

Lueras has not made any payment on the Loan since July 2010.

In October 2010, more than three months after Lueras stopped making reduced monthly payments, and more than twenty-two months after he stopped making regular monthly payments, ReconTrust Company (ReconTrust) recorded and served a Notice of Default (the Notice of Default) on Lueras.

The Notice of Default advised Lueras of his rights under the Loan Documents to cure the payment default and reinstate the Loan to avoid acceleration and sale. Lueras did not allege he exercised his right to pay the delinquent amount, cure the default, and reinstate the Loan.

The Notice of Default also advised Lueras, "Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure." Lueras did not allege he tried to sell the Property prior to the trustee's sale.

In February 2011, more than six months after Lueras stopped making reduced monthly payments, and more than twenty-five months after Lueras stopped making regular monthly payments, ReconTrust recorded and served a Notice of Trustee's Sale (Notice of Sale).

The trustee's sale was originally set for February 22, 2011, and was subsequently postponed three times to "3/2/11, 4/1/11, and 5/4/11."

On May 5, 2011 Bank of America sent Lueras a letter stating he did not qualify for a modification under the Home Affordable Modification Program (HAMP).

4

Immediately after receiving the May 5 letter, "[Lueras] contacted Nancy Whitaker at Bank of America who advised plaintiffs [*sic*] that that letter was sent by a third party 'home retention' vendor and was an error. Ms. Whitaker further advised that plaintiffs were put into a program that was already approved . . . [and s]he just needed Fannie Mae's approval."

On May 6, 2011 Bank of America sent Lueras another letter stating his financial documents were being reviewed to determine if he qualified for a HAMP modification.

Immediately after receiving the May 6 letter, Lueras contacted Bank of America and was "informed this letter was sent in error as plaintiffs [*sic*] had already 'been approved' by the bank. Nancy Whitaker of Bank of America advised that the scheduled Trustee's Sale of May 18, would be reset, pending approval of FANNIE MAE."

Lueras implied but did not allege there was an "actual sale" on May 18, 2011. Lueras also did not allege he was deprived of ownership or possession of the Property as a result of that sale.

Lueras did allege he retained ownership and possession of the Property at all relevant times up to and including the date the first amended complaint was filed.

B. *Lueras's Factual Admissions*

Lueras repeatedly admitted the trustee's sale was rescinded before the trustee's deed was recorded. These admissions were made in his written briefs and oral arguments both in the trial court and in this court, all as described below.

In his opposition to the demurrers to the original complaint, Lueras admitted "after this lawsuit was filed the trustee was able to rescind" the trustee's sale.

At the hearing on the demurrers to the original complaint, counsel for Lueras admitted, "I should inform the court that the sale was rescinded, so we are now at pre-foreclosure status. "

5

Similarly, in his opposition to the demurrers to the first amended complaint, Lueras again admitted "after this lawsuit was filed the trustee was able to rescind" the trustee's sale.

And, at the hearing on the demurrers to the first amended complaint, counsel for Lueras admitted, "as the court properly noted in the tentative ruling, there was a rescission in this case."

In his opening brief on appeal, Lueras admitted, "after this lawsuit filed, the trustee was able to rescind" the trustee's sale; "the [trial] court focused on the sale that was rescinded after the litigation ensued"; and "as the [trial c]ourt noted, the sale had been rescinded."

Likewise, in his reply brief on appeal, Lueras admitted and argued, "[t]he rescission of the trustee's deed upon [*sic*] does not moot Mr. Lueras' claims"; "after the lawsuit was filed, BANA [Bank of America] rescinded the trustee's deed upon sale"; and "the trustee's deed upon sale was not recorded . . . ."

Finally, at oral argument in this court, counsel for Lueras admitted there is no record of the trustee's sale, the trustee's deed was never recorded, and Lueras still has title to and possession of the Property.

## DISCUSSION

A.  *Standard of Review and Lueras's Burden on Appeal*

"When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.  [Citations.]  The burden of proving such reasonable possibility is squarely on the plaintiff.  [Citation.]"  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

6

"'To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.] . . . . The plaintiff must clearly and specifically set forth the "applicable substantive law" [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.]'" (*Rossberg v. Bank of America* (2013) 219 Cal.App.4th 1481, 1491.)

No authority commands or even suggests these pleading requirements do not apply unless the plaintiff has been given more than two bites at the apple. We are required to affirm the ruling if there is any ground on which the demurrer could have been properly sustained. (*Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752.) Also, leave to amend should not be granted where an amendment would be futile. (*Newell v State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1100.) It is axiomatic, "The law neither does nor requires idle acts." (Civ. Code, § 3532.)

### B. *Factual Allegations, Judicial Notice and Factual Admissions*

We accept the factual allegations of the verified first amended complaint as true. "'We also consider matters which may be judicially noticed.' (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.)" (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) To that end, I take judicial notice (Evid. Code § 452, subd. (d)) the trial court's final minute order ruling on the demurrers expressly relied upon the fact that, "plaintiff admits in the Opposition that the foreclosure sale was rescinded."

We also take into account briefs and arguments, which are "reliable indications of a party's position on the facts as well as the law, and a reviewing court may use statements in them as admissions against the party. [Citations.]" (9 Witkin, California Procedure (5th ed. 2008) Appeal, § 335, p. 386.) Likewise, "[a]n express concession or assertion in a brief is frequently treated as an admission of a legal or factual point, controlling in the disposition of the case. [Citations.]" (*Id.*, § 704, p. 773.)

7

One court citing Witkin held an admission in the opening brief was "the equivalent of a concession," which, taken together with the failure to allege a necessary element, "controls the disposition of the case." (*Federer v. County of Sacramento* (1983) 141 Cal.App.3d 184, 186.) Another court also citing Witkin relied on concessions made by plaintiff's counsel during oral argument to show there was no basis for a cause of action. (*DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1019, fn. 3, superseded by statute on another ground as stated in *Ramona v. Superior Court* (1997) 57 Cal.App.4th 107, 112, fn. 6.)

In *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485 the court affirmed an order sustaining a demurrer without leave to amend, and expressly relied on the factual allegations and omissions in the complaint, together with factual admissions in the trial court and in appellant's briefs. (*Id.* at p. 1515, fn. 19, citing, inter alia, *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 725 [oral statement by counsel in same action is binding judicial admission] & *Electric Supplies Distributing Co. v. Imperial Hot Mineral Spa* (1981) 122 Cal.App.3d 131, 134 [stipulations in brief constitute binding judicial admissions].)

Similarly, in *Setliff v. E. I. Du Pont de Nemours & Co.* (1995) 32 Cal.App.4th 1525 the court affirmed an order sustaining a demurrer without leave to amend and stated, "Plaintiff's papers in opposition are reliable indications of his position on the facts and we may use these statements as admissions against him. [Citation.]" (*Id.* at p. 1536.) Likewise, in *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, the court declared, "We also may, and shall, take judicial notice of admissions in plaintiff's opposition to the demurrer. (Evid. Code, § 452, subd. (d).)" (*Id.* at p. 518.)

In sum, we are not permitted to turn a blind eye to Lueras's admissions the trustee's sale was rescinded before the trustee's deed was recorded. These admissions are consistent with his verified affirmative allegations he was never deprived of ownership or possession of the Property. These admissions were properly considered by the trial court

8

when ruling on the demurrers, without any objection by Lueras.  We are required to do the same when reviewing the propriety of those rulings.

### C.  Negligence and Negligent Misrepresentation

The long-standing rule that a residential lender does not owe any duty of care to a borrower is well settled and summarized in the majority opinion.  I would only add that all of the reasons why a residential lender owes no such duty to a borrower apply with even greater force to a servicer, even though courts are not always careful to differentiate between the duties of lenders and the duties of servicers.  (*Somera v. IndyMac Fed. Bank, FSB* (E.D.Cal. May21, 2010) [2010 WL 761221, p. *5].)

Applying the no-duty rule to the negligence claim, the majority recognizes Bank of America did not owe Lueras a duty to offer, consider, or approve a loan modification, or to explore and offer foreclosure alternatives, or to handle the Loan in any other way so as to prevent foreclosure.  I agree.  These are all core functions well within the scope of the conventional role of a residential lender and the no-duty rule applies.

Despite recognizing the no-duty rule, the majority stretches to create an exception, and concludes Bank of America "does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale."  I disagree.  There is no such exception.  No duty is owed for purposes of negligent misrepresentation or negligence. (*Aspiras v. Wells Fargo Bank, N.A.* (2013) 219 Cal.App.4th 948, 963-964.)

"As is true of negligence, responsibility for negligent misrepresentation rests upon the existence of a legal duty . . . owed by a defendant to an injured person. [Citation.]  The determination of whether a duty exists is primarily a question of law. [Citation.]"  (*Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 864.)  "[T]he test for determining whether a financial institution owes a duty of care to a borrower-client "'involves the balancing of various factors . . . .'"  [Citations.]"  (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1098.)

9

Without balancing the various factors discussed in *Nymark*, the majority discovers a duty which has never before been recognized. But there is no reasoned basis for making any distinction between these residential lender-borrower communications and other residential lender-borrower communications. Communications about the status of a modification application or a trustee's sale are also core functions well within the scope of the conventional role of a residential lender. Hence, the no-duty rule applies equally to negligence and negligent misrepresentation claims in this situation.

Furthermore, the rights and duties of lenders and borrowers regarding these communications are set forth in the Loan Documents and applicable law, including the Federal Truth in Lending Act (15 U.S.C. § 1601 et seq.) and the California statutory nonjudicial foreclosure statutes (Civ. Code, §§ 2924 through 2924k.). It is inconsistent with these comprehensive and exhaustive statutory schemes to incorporate common law negligent misrepresentation claims in this context. (Cf. *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1154; *Residential Capital v. Cal-Western Reconveyance Corp.* (2003) 108 Cal.App.4th 807, 824-829.)

Leaving aside the duty question, Lueras did not request leave to plead a negligent misrepresentation cause of action. But even if he had, Lueras also did not demonstrate a reasonable possibility he can plead "'"(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."' [Citation.]" (*Wells Fargo Bank, N.A. v. FSI, Financial Solutions, Inc.* (2011) 196 Cal.App.4th 1559, 1573.)

Lueras alleged both oral and written misrepresentations by Bank of America about the status of the loan modification application and the trustee's sale.

The alleged oral misrepresentations were all made by Whitaker in early May 2011 and may be summarized as follows. First, Whitaker told Lueras the May 5 and May 6 letters had been sent in error. Second, she told him the loan modification

10

application had been approved by Bank of America, subject to Fannie Mae approval. Third, she told him the trustee's sale would be reset, again pending Fannie Mae approval.

Regarding the statements the May 5 and 6 letters had been sent in error, Lueras did not allege and cannot allege these statements were untrue or that Whitaker had no reasonable ground for believing them to be true. Obviously, his entire case is predicated upon his alleged reliance on the truth of these statements.

Regarding the statement Bank of America had approved the loan modification application, subject to Fannie Mae approval, again Lueras did not allege this statement was untrue or Whitaker had no reasonable ground for believing it to be true. Besides, this statement is conditional, and he did not allege that condition was satisfied.

Regarding the statement the trustee's sale would be reset, while Lueras did allege this was untrue, he did not allege Whitaker said the trustee's sale *had been* reset. Instead he alleged she said it *would be* reset. So this statement is really a prediction about a future event, not a misrepresentation about a past or existing fact.

Lueras also did not allege any facts showing he justifiably relied on the statement the trustee's sale would be reset. In particular, Lueras did not allege he did or refrained from doing anything after this statement was made (on May 6, 2011) and before the trustee's sale occurred (on May 18, 2011). All of the alleged actions or inactions took place well before this statement was made.

Regarding all of these statements, Lueras did not allege and cannot allege any resulting damage. Again the trustee's sale was rescinded so Lueras was never deprived of ownership or possession of the Property.

Regarding the alleged written misrepresentations in the May 5 and 6 letters, Lueras cannot allege he reasonably relied on the contents of those letters, and at the same time allege he relied on the statements that those letters had been sent in error. He cannot have it both ways. But even if he could, again Lueras did not allege and cannot allege he suffered any resulting damage, because the trustee's sale was rescinded.

11

In conclusion, Lueras did not plead or demonstrate a reasonable possibility he can plead sufficient facts to establish the elements of a negligent misrepresentation cause of action against Bank of America based upon communications concerning the status of the loan modification application or the trustee's sale. Hence, there is no basis for granting Lueras's leave to allege a negligent misrepresentation cause of action.

### D. Breach of Contract

Lueras alleged Bank of America breached the Forbearance Agreement by terminating the deferral period, and by failing to offer him a loan modification or some other resolution before commencing or resuming the foreclosure process. But Lueras did not plead sufficient facts to establish the elements of this claim.

### 1. Breach

Lueras did not plead any facts showing Bank of America breached the Forbearance Agreement "by terminating the 'Deferral Period'. . . ." Actually, Lueras did not plead any facts showing Bank of America terminated the deferral period at all. On this point, I agree with the majority opinion. Examining the first amended complaint as a whole reveals the parties intended the deferral period to terminate and it did terminate by its own terms no later than March 16, 2010.

Lueras also did not plead any facts showing Bank of America breached the Forbearance Agreement by failing to offer him a loan modification or some other resolution before commencing or resuming the foreclosure process. The Forbearance Agreement simply did not require Bank of America to do or abstain from doing any of the things Lueras complained of. Thus, Bank of America did not breach the Forbearance Agreement by failing to offer Lueras a loan modification or some other resolution before commencing or resuming the foreclosure process.

Recognizing the inevitability of this conclusion, the majority asserts the "provisions of [Fannie Mae] Announcement 09-05R must be read into" the Forbearance Agreement to circumvent these deficiencies. The majority has not cited any case which

12

has followed this approach or found a borrower has a private contractual right to sue a lender for money damages based upon alleged noncompliance with Announcement 09-05R. (Cf. *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1399 [HAMP and programs like HAMP consistently construed to create no private rights or private causes of action for borrowers].) One can easily see why.

To begin with, the Forbearance Agreement is a contract between Lueras, as the borrower under the Loan Documents, and Bank of America, as the servicer and the ostensible agent of the lender under the Loan Documents. Fannie Mae is not a party to the Forbearance Agreement and Lueras did not allege the Loan is owned or insured by Fannie Mae. In short, it appears Fannie Mae is a complete stranger to the Forbearance Agreement with no contractual rights or obligations thereunder vis-à-vis the Loan.

Next, reading Announcement 09-05R into the Forbearance Agreement violates basic principles of contract formation and interpretation. Announcement 09-05R was not part of the Forbearance Agreement offer or acceptance. In fact, there is no reference to Announcement 09-05R in the Forbearance Agreement, and there is no ambiguity in the Forbearance Agreement which requires or even permits resort to this extrinsic evidence for interpretation. Doing so contradicts some of the express terms of the Forbearance Agreement, and renders other express terms meaningless.

The only case cited by the majority to support this radical departure from established law is *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 . *West* is legally and factually inapposite.

The contract at issue in *West* was a trial period plan (TPP) under HAMP, while the Forbearance Agreement at issue here is not. Indeed, the Forbearance Agreement bears no resemblance in form or function to a TPP under HAMP. They are different creatures which serve different purposes. A TPP tests the viability of an identified and agreed upon long-term solution. The Forbearance Agreement merely provides time to see if a viable long-term solution can be identified and agreed upon.

13

In addition, the TPP in *West* was still in effect, and the borrower tendered a timely reduced monthly payment just two days before the trustee's sale. (*West v. JPMorgan Chase Bank, N.A.*, *supra*, 214 Cal.App.4th at p. 790.) Here, the Forbearance Agreement ended no later than March 16, 2010, and Lueras stopped making reduced monthly payments on July 1, 2010, more than nine months before the trustee's sale.

Lastly, the majority suggests the implied covenant of good faith and fair dealing may also be used to circumvent these deficiencies. Not so. "[A]n implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1014.) Similarly, the implied covenant cannot be used to create additional obligations not present in a contract, and cannot be used to vary the terms of an unambiguous contract. (*21st Century Ins. Co. v. Superior Court* (2009) 47 Cal.4th 511, 527.)

*2. Damages*

Lueras did not plead any facts showing he was damaged by Bank of America's alleged termination of the deferral period or failure to offer him a loan modification or some other resolution before commencing or resuming the foreclosure process. Lueras was always obligated to repay the Loan, and the reduced monthly payments allegedly made during and after the deferral period, together with any late fees and charges resulting from his payment default, were always owed under the Loan Documents, separate and apart from the Forbearance Agreement.

*3. Leave to Amend*

Lastly, Lueras did not demonstrate a reasonable possibility he can plead sufficient facts to establish the elements of a breach of contract cause of action against Bank of America. It is not sufficient for Lueras to assert "an abstract right to amend." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.) Again, he must set forth the legal authority for the claim, the elements of the claim, and the specific factual allegations that would establish each of those elements. (*Rossberg v. Bank of*

14

*America*, *supra*, 219 Cal.App.4th at p.1491.) Lueras made no attempt to meet this burden. Therefore, the demurrers to the breach of contract cause of action based upon the Forbearance Agreement were properly sustained without leave to amend. On this point the majority opinion's reliance upon the liberal policy regarding amendments to justify a contrary result is misplaced. (*Id.*, at p. 1503.)

### E. Fraud

The majority states the elements of a fraud cause of action. They are the same as the elements of a negligent misrepresentation cause of action discussed above, with the exception of the knowledge element. (*Aspiras v. Wells Fargo Bank, N.A., supra,* 219 Cal.App.4th at p. 963, fn. 4.) Since the elements are essentially the same, all of the deficiencies in the negligent misrepresentation claim discussed above are also deficiencies in the fraud claim. There are additional deficiencies as well.

Lueras alleged, based upon the Forbearance Agreement, Bank of America led him to believe it was going to work with him so he could stay in his home as long as he made the requested (i.e. reduced) monthly payments, but instead Bank of America concealed the fact it was not going to identify a long-term solution. Yet, Lueras did not allege any part of the Forbearance Agreement was false. And, once again, nothing in the Forbearance Agreement required Bank of America to offer Lueras a loan modification or identify another resolution.

Lueras also alleged the May 5 letter stated Bank of America would contact Lueras in 10 days to explore foreclosure alternatives, but this statement was false, because the trustee's sale occurred before the 10 days had elapsed. Then again, Lueras alleged he relied on the fact he was told the May 5 letter had been sent in error, so any alleged reliance on the contents of that letter was unreasonable. Once more, he cannot have it both ways. Plus, his alleged reliance in making the reduced monthly payments ended in July 2010, more than 10 months before the May 5 letter was sent.

15

For all of these reasons, I agree with the majority the demurrers to the fraud cause of action were properly sustained. On the other hand, I do not agree with the majority, "the exhibits attached to the First Amended Complaint . . . demonstrate there is a reasonable possibility the defects in the fraud cause of action can be cured by amendment." The exhibits at issue are the May 5 and 6 letters.

On this point, the majority relies on the same faulty logic as Lueras.[1] But any alleged reliance on the May 5 and 6 letters was patently unreasonable because Lueras pled he relied on the oral representation those letters had been sent in error.

And at any rate, Lueras did not and cannot allege any "specific damages" he suffered, because the trustee's sale was rescinded. (*Rossberg v. Bank of America*, *supra*, 219 Cal.App.4th at p. 1499.) Consequently, the demurrers to the fraud cause of action were properly sustained without leave to amend.

### F. Business and Professions Code Section 17200

Finally, I disagree with the majority statement, "the allegation that Lueras's home was sold at a foreclosure sale is sufficient to satisfy the economic injury prong of the standing requirement of section 17204." There is no such allegation in the first amended complaint. And, in any event, the exact opposite is true. Lueras has not suffered any legally cognizable harm. Rather, he has experienced an incredible windfall. Lueras has avoided foreclosure on the Property even though he has not made any payment on the Loan since July 2010. Hence, Lueras has no standing and the demurrers to the unfair competition claim were properly sustained without leave to amend.

---

[1] For example, the majority states: "In the May 5, 2011 letter, Bank of America informed Lueras any pending foreclosure sale would be 'on hold' . . . . Whitaker . . . told him the May 5 letter was sent in error . . . . Despite the express representation in the May 5 letter that no foreclosure sale would proceed, . . . the foreclosure sale was conducted on May 18."

## CONCLUSION

The trial court correctly sustained the demurrers to the first amended complaint and did not abuse its discretion by denying leave to amend. The contrary decision by the majority represents a departure from settled law and creates uncertainty which may disrupt California residential lending. The judgment should be affirmed.


THOMPSON, J.