Clarisa A. WELTE

v.

**WELLS FARGO BANK NATIONAL ASSOCIATION et al.**

Case No. EDCV 13-463 JGB (SPx)

United States District Court, C.D. California.

Filed 05/27/2016

Court of Appeal to decline to apply Harrison to this case.

Michael R. Weinstein, Scott H. Toothacre, William A. Lee Biddle, Ferris & Britton APC, San Diego, CA, for Clarisa A. Welte.

Laura J. Petrie, Law Offices of Petrie & Associates, Laguna Niguel, CA, Cathy A. Knecht, Jeffrey Burns Gardner, Barry, Gardner & Kincannon, APC, Carlsbad, CA, for Wells Fargo Bank National Association et al.

**Proceedings: Judgment and Order GRANTING Defendants' Motion for Summary Judgment (Dkt. No. 75)**

Present: The Honorable JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

Before the Court is Defendant Wells Fargo Bank, N.A.'s Motion for Summary Judgment. (Dkt. No. 75.) After consideration of the papers filed in support of and in opposition to the motion, and the argument presented at the May 23, 2016 hearing, the Court GRANTS the motion.

### I. BACKGROUND

On March 12, 2013, Plaintiff Clarisa A. Welte ("Plaintiff" or "Clarisa") filed a complaint against Defendants Wells Fargo Bank, N.A ("Wells Fargo"), Federal National Mortgage Association ("Fannie Mae"), and Shaun Donovan, the Secretary of the U.S. Department of Housing and Urban Development ("HUD"). (Complaint, Dkt. No. 1.) Plaintiff's claims relate to a reverse mortgage that her now-deceased husband, Kenneth Welte, purchased from Wells Fargo in 2005.

On April 18, 2013, Defendants filed a motion to dismiss the Complaint, (Dkt. No. 8), which the Court granted in part and denied in part on May 29, 2013, (May 29, 2013 Order, Dkt. No. 16). After Plaintiff filed a First Amended Complaint, (Dkt. No. 17), Defendants filed another motion to dismiss, (Dkt. No. 19), which the Court granted in part and denied in part, (Dec. 18, 2014 Order, Dkt. No. 24). On December 30, 2014, Plaintiff filed a Second Amended Complaint. ("SAC," Dkt. No. 25.)

On February 28, 2014, Plaintiff voluntarily dismissed Shaun Donovan from the SAC, (Dkt. No. 34), and on May 29, 2015, she voluntarily dismissed Fannie Mae. (Dkt. No. 47.) Then on June 3, 2015, Plaintiff dismissed several of her claims against Wells Fargo. (Dkt. No. 49.) Wells Fargo brought a third motion to dismiss the remaining claims, (Dkt. No. 50), which the Court denied on July 14, 2015, (Dkt. No. 54). Thus, Plaintiff maintains the following claims against Wells Fargo: negligence, deceit by concealment or nondisclosure, constructive fraud, and financial elder abuse. (SAC ¶¶ 47-73.)

On April 11, 2016, Wells Fargo filed a motion for summary judgment as to all four remaining claims. ("Mot.," Dkt. No. 75.) In support of its motion, Wells Fargo filed the following documents:

- Statement of Uncontroverted Facts and Conclusions of Law, ("DSUF," Dkt. No. 75-2);

- Request for Judicial Notice,[1] ("RJN," Dkt. No. 75-3);

- Declaration of Jeffrey Taylor, ("Taylor Decl.," Dkt. No. 75-4);

- Declaration of Cathy K. Robinson, ("Robinson Decl. I," Dkt. No. 75-5);

- Excerpts of the Deposition of Cynthia Savala, ("Savala Dep.," Dkt. No. 75-6);

- Excerpts of the Deposition of Carole Sparrow, ("Sparrow Dep.," Dkt. No. 75-7); and

- Excerpts of the Deposition of Clarisa A. Welte, ("Welte Dept.," Dkt. No. 75-8);

Plaintiff opposed Wells Fargo's motion on April 18, 2016. ("Opp.," Dkt. No. 78.) In support of her opposition, Plaintiff submitted the following documents:

- Declaration of Michael R. Weinstein, ("Weinstein Decl.," Dkt. No. 78-3 at 41), attached to which are 31 exhibits, (Dkt. Nos. 78-2 to 78-3);

- Statement of Genuine Disputes of Material Facts ("SGD") and Statement of Additional Material Facts ("PSUF"), (Dkt. No. 78-4); and

- Evidentiary Objections, (Dkt. No. 78-5).

On April 25, 2016, Wells Fargo filed a reply memorandum in support of its motion. ("Reply," Dkt. No. 79.) Wells Fargo also replied to Plaintiff's statement of additional facts, ("PSUF Reply," Dkt. No. 79-3), and Plaintiff's evidentiary objections, (Dkt. No. 79-1); submitted its own evidentiary objections to Plaintiff's evidence, (Dkt. Nos. 79-2, 79-4); and filed two additional declarations: the declaration of Linda Bridges, ("Bridges Decl.," Dkt. No. 79-5), and a second declaration from Cathy Robinson, ("Robinson Decl. II," Dkt. No. 79-6). The Court held a hearing on the motion on May 23, 2016.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue

---

1. Wells Fargo requests that the Court take judicial notice of the Weltes' 2011 petition for bankruptcy. This information is irrelevant to the Court's determination of this motion. As such, he Court declines to take judicial notice of the bankruptcy petition.

as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250, 106 S.Ct. 2505.

■ Generally, the burden is on the moving party to demonstrate its entitlement to summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and presenting evidence that it believes demonstrates the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325, 106 S.Ct. 2548. Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case. Id. The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Anderson, 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322, 106 S.Ct. 2548; Anderson, 477 U.S. at 252, 106 S.Ct. 2505; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir.2010) (citing Anderson, 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. at 387 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630–31 (9th Cir.1987).

### III. FACTS

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motion for Summary Judgment. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### A. Reverse Mortgages

The federal government, through the U.S. Department of Housing and Urban Development ("HUD"), administers a program called the Home Equity Conversion Mortgage ("HECM") program. (DSUF ¶¶ 1, 3.) The HECM program was created by Congress in 1987 to enable elderly homeowners to convert the equity in their homes to monthly streams of income and/or lines of credit or lump sum payments. (Id. ¶ 4.) Loan proceeds in an HECM—or a "reverse mortgage"—are paid out according to a payment plan selected by the borrower. (Id. ¶ 5.) In a reverse mortgage, there are no monthly

payments. (PSUF ¶ 303.) Instead, the reverse mortgage is repaid in one payment, after the death of the borrower(s), upon sale of the home, or when the borrower no longer occupies the property as a principal residence. (DSUF ¶ 6.)

To qualify for a reverse mortgage, applicants must be at least 62 years of age. (Id. ¶ 8.) Loan amounts are based on the value of the home, the interest rate, and the age of the youngest borrower. (Id. ¶ 9.) Older borrowers qualify for higher loan amounts than younger borrowers under the HECM program. (Id. ¶ 10.)

HUD mandates that all potential borrowers complete a counseling program prior to applying for a reverse mortgage. (Id. ¶ 11.) The HUD counselors are independent from lending institutions: they receive separate training and testing by HUD and are employed by separate, third-party agencies. (Id. ¶ 12.) The HUD counselors cannot have any affiliations with lenders or loan originators. (Id. ¶ 13.) Representatives from lending institutions are not present during HUD counseling. (Id. ¶ 18.)

The purpose of the mandatory HUD counseling is to inform potential borrowers of the implications of and alternatives to a reverse mortgage. (Id. ¶ 14.) Counselors educate potential borrowers about the loan, assess financial needs of the applicants, discuss alternatives, and answer any questions that might arise. (Id.) At the completion of the HUD counseling, if the counselor determines that the potential borrower(s) understood the major components of the loan program, the counselor will issue a HUD certificate. (Id. ¶ 16.) Loan processing for a reverse mortgage under the HECM program cannot continue without a signed HUD counseling certificate. (Id. ¶ 17.)

In addition to the mandatory counseling, HUD also issues guidelines and requirements for reverse mortgage lenders. (Id. ¶ 20.) In 2014, HUD issued "Mortgagee letter 2014-07 (April 25, 2014)" and later, "Mortgagee letter 2015-15 (June 12, 2015)." (Id. ¶ 23.) These letters require lenders to identify and issue certain disclosures to eligible and non-eligible non-borrowing spouses. (Id.) Prior to 2014, no HUD guideline required disclosures to non-borrowing spouses nor prevented the issuance of a reverse mortgage to a borrower after taking a co-owner of the property off title prior to closing the loan. (Id. ¶ 21.)

**B. The Weltes**

Married since 1959, Kenneth Welte ("Ken") and his wife Clarisa entered retirement in 1997. (PSUF ¶¶ 147, 149.) Later that year, the Weltes obtained title as joint tenants to certain real property in Temecula, California (the "residence"), where they intended to live out their retirement. (DSUF ¶ 26; see also May 19, 2013 Declaration of Clarisa Welte ("2013 Welte Decl.") ¶ 5, Ex. 33.) The Weltes had two liens on their residence: a first lien on the in favor of Downey Savings Bank, and a junior line of credit secured by the property in favor of Bank of America, N.A. (DSUF ¶ 32.) By 2005, the Weltes were having financial difficulties. (PSUF ¶ 153.) They were living on a fixed income consisting of social security and a modest retirement. (Id.) Their monthly income was less than their monthly expenses, which included a mortgage payment on the residence. (Id.)

In early 2005, Ken showed Clarisa a newspaper advertisement concerning a reverse mortgage and told her he was going to call Wells Fargo. (PSUF ¶ 154.) Ken called Cheryl Hagar, a Reverse Mortgage Consultant ("RMC") with Wells Fargo, to inquire about a reverse mortgage. (Id.) Cheryl Hagar then mailed the Weltes an advertisement regarding reverse mortgage loans. (DSUF ¶ 35.) The ad stated, "A

reverse mortgage is a loan that enables senior homeowners to convert part of the equity in their home into tax-free income without having to sell their home, give up title, or take on a new monthly mortgage payment." (Id. ¶ 36.) Ken and Clarisa felt that a reverse mortgage could be an answer to their financial difficulties. (PSUF ¶ 155.)

After mailing the ad to the Weltes, Cheryl Hagar visited the Weltes in their home on two occasions. (PSUF ¶ 156.) The first meeting lasted about an hour and the second meeting lasted about an hour and a half. (Id.) During the first meeting, Hagar told Ken and Clarisa that if they took out a reverse mortgage on their residence they would have no mortgage payments and that they would be able to live at their residence as long as either of them was alive. (Id.) From what Hagar told them, Clarisa understood that if either she or her husband passed away, the survivor would be able to continue to live in the residence until their death. (Id.) During the second meeting, Hagar reiterated that both Clarisa and Ken would be able to stay in the home until they both died. (Id.)

Clarisa does not remember much else from these meetings. She has no recollection of whether Cheryl Hagar discussed how much money the Weltes could obtain from a reverse mortgage loan at the second meeting, or if they discussed whether they could get more money if just Kenneth applied for the loan. (DSUF ¶ 64.) She has no recollection of whether or not Hagar went over the loan application with Kenneth during the second meeting. (Id. ¶ 66.) Nor does she remember whether or not Hagar asked her or Kenneth for their personal information. (Id. ¶ 67.) She does not remember whether she had any conversations with Hagar about filling out a loan application. (Id. ¶ 68.) Clarisa does not recall whether she had any conversations

with Hagar about removing herself from title to the property. (Id. ¶ 88.)

Hagar does not recall the Weltes at all. (Deposition of Cheryl Hagar ("Hagar Dep.") at 94:9-13, Dkt. No. 78–1 at 58.) At her deposition, Hagar testified that, as a general rule, once borrowers were prepared to fill out a reverse mortgage application, she would require potential borrowers to do HUD counseling. (Hagar Dep. at 99:13-24.) She never took an application from a customer before they went to HUD counseling. (Id. at 100:4-7.) When potential customers are sent to HUD counseling, the loan originator does not know who holds title to the property or how much the property is worth. (Id. at 106:14-21.)

On March 15, 2005, Ken and Clarisa completed mandatory HUD counseling with Linda Sparrow. (PSUF ¶ 157.) The HUD counseling took place over the telephone with Ken and Clarisa on speaker phone. (Id. ¶ 158.) Clarisa does not recall if there was any discussion about the consequence of transferring title from her to Ken prior to the execution of the reverse mortgage. (Id.) Linda Sparrow does not remember the Weltes, but she testified at her deposition that if it was the case that the reverse mortgage loan was not enough to pay off the liens on the property, she would tell potential borrowers that more money might be available if the younger borrower were taken off the title. (Sparrow Dep. at 17:3-7, 37:18-39:22.) Sparrow said she "always" cautioned potential borrowers that if one spouse was taken off the title of the property and was not listed on the reverse mortgage, and the borrowing spouse passed away, the loan becomes due and payable at the borrowing spouse's death notwithstanding the fact that the younger, non-borrowing spouse still lived at the property. (Id.)

On March 23, 2005, Kenneth signed a reverse loan application as the only bor-

rower. (DSUF ¶ 71.) It was Hagar's practice to input the data into the reverse loan application for the borrower to sign. (Hagar Dep. at 120-121.) Hagar testified that the only reason she would have omitted Clarisa's name from the loan application is because Ken told her that he is going to be the only borrower. (Id. at 130-131.) At the time Hagar created the loan application, the only information she had regarding any outstanding liens against the property or the value of the property were estimates supplied by the Weltes; no appraisal had yet been done nor a title report issued. (Hagar Dep. at 129, 202-203.) Hagar doesn't recall ever having a situation where two age-eligible borrowers were co-owners of a property and one of them was taken off title before the reverse mortgage loan was made. (Id. at 188-189.) She did not have a practice or procedure of discussing with potential borrowers whether or not to take an age-eligible borrower off the title. Id. Clarisa has no recollection or personal knowledge as to when the decision was made to apply for the loan. (DSUF ¶ 65.) Clarisa has no recollection of whether she had any conversations with Kenneth about why he was the sole borrower on the loan. (Id. ¶ 72.)

On March 24, 2005, the title company sent escrow instructions addressed to both Ken and Clarisa for their review, approval, and signature. (PSUF ¶ 160.) The escrow instructions provided that upon close of the reverse mortgage loan, the title company would issue a policy of title insurance covering the residence and showing title vested in Ken and Clarisa as joint tenants. (Id.) Ken signed the escrow instructions and marked an "X" in the location where Clarisa would have signed. (Dkt. 79–5 at 19.)

On April 11, 2005, an appraisal of the residence was done, valuing the property at $415,000. (PSUF ¶ 163.) On April 21, 2005, Cynthia Savala, a loan processor with Wells Fargo, sent Ken a Reverse Mortgage Commitment Letter. (Id. ¶ 164.) On April 29, 2005, Savala updated the Weltes' loan application with the appraised value of the property and added the junior lienholder, Bank of America, which had not been included in the initial application.[2] (DSUF ¶ 103.) Savala testified that she confirmed with Ken that he was going to be the only borrower on the reverse mortgage. (Deposition of Cynthia Savala at 127:12-19, Dkt. No. 75–6 at 18.) She also confirmed this with Cheryl. (Id.)

On May 6, 2005, a notary came to the Weltes' home with documents for them to sign concerning the reverse mortgage. (PSUF ¶ 171.) Ken executed various loan documents as the sole borrower. (DSUF ¶ 115.) Clarisa executed a quitclaim deed conveying her interest in the residence to Ken. (DSUF ¶ 116.) Clarisa does not remember any conversation with the notary other than she needed to sign one document for the reverse mortgage. (PSUF ¶ 172; DSUF ¶ 109.) She does not remember what the document was. (Id.) The reverse mortgage Ken executed specifically provided that Wells Fargo may require payment in full of all outstanding principal and accrued interest if Ken died and the property is not the principal residence of at least one surviving borrower. (DSUF ¶ 117.) The Deed of Trust also provided that Wells Fargo could require immediate payment in full upon Ken's death. (Id. ¶ 118.)

That same day, Ken sent Hagar an email asking her how to get Clarisa back on the title. (Ex. H to 2013 Welte Decl.)

---

**2.** The parties dispute whether this was a "second" loan application or an "updated" application. (See Response to SUF ¶ 104.) This dispute is not material to the disposition of this motion.

Hagar replied that she can have someone named Judy at United Title Company do a grant deed to put her back on title. (Id.) On May 16, 2005, the title company sent a HUD settlement statement to Ken. (Id. ¶ 119.) Pursuant to the HUD settlement, both of the liens on the residence were paid in full and Ken received a $946.92 refund. (Id. ¶ 120.) On May 24, 20015, a grant deed conveying Clarisa back on title to the residence was recorded. (DSUF ¶ 122.)

Ken passed away on July 18, 2011. (Id. ¶ 123.) After his death, Clarisa received a Wells Fargo loan statement stating that the current outstanding principal balance on the reverse mortgage loan was almost $272,000. (PSUF ¶ 185.) In mid-October 2011, Clarisa called Wells Fargo and asked to speak with someone about the balance, but was told that because she was not a borrower on the loan, the representative could not talk to her about the loan. Until Clarisa spoke with a Wells Fargo representative in 2011 she believed she was a borrower on the loan. (Id. ¶ 188.)

On November 26, 2012, Wells Fargo sent Plaintiff a demand letter for the full amount of the loan. (Id. ¶ 189.) On February 11, 2013, Wells Fargo recorded a Notice of Default on the property. (Id. ¶ 192.) In April 2015, Plaintiff was given a deferment of the loan, which allows her to live at the residence until she dies. (DSUF ¶ 125.)

## IV. DISCUSSION

Wells Fargo moves for summary judgment as to all four claims remaining against it: negligence, deceit by concealment or nondisclosure, constructive fraud, and financial elder abuse. (See Mot.) Plaintiff opposes. (See Opp.) The Court addresses the merits of each claim in turn.

### A. Duty of Care

■ For Plaintiff to be successful on her claims for negligence,[3] deceit by concealment or nondisclosure,[4] and constructive fraud,[5] Plaintiff must establish that Wells Fargo owed Plaintiff a duty to disclose to her the consequences of removing herself from the title to her residence prior to closing the reverse mortgage loan.

■ Under California law, lenders generally do not owe borrowers a duty of care unless their involvement in the loan transaction exceeds the scope of their "conventional role as a mere lender of money." Nymark v. Heart Fed. Sav. & Loan Ass'n, 231 Cal.App.3d 1089, 1096, 283 Cal.Rptr. 53 (1991). Plaintiff argues that Wells Fargo exceeded the scope of its conventional role as a mere lender of money and therefore had a duty to disclose to Clarisa the

---

3. To establish liability for negligence, Plaintiff must prove that Wells Fargo owed Plaintiff a legal duty to use due care; that Wells Fargo breached that duty; and that the breach was the proximate or legal cause of the resulting injury. Ladd v. County of San Mateo, 12 Cal.4th 913, 917, 50 Cal.Rptr.2d 309, 911 P.2d 496 (1996).

4. "[T]he elements of an action for fraud and deceit based on concealment are (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff; (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." Boschma v. Home Loan Center, Inc., 198 Cal.App.4th 230, 248, 129 Cal.Rptr.3d 874 (2011).

5. To establish a claim for constructive fraud, Plaintiff must show (1) a breach of duty which, without an actual fraudulent intent, (2) gains an advantage to the person in fault... by misleading another to his prejudice." Cal. Civ. Code § 1573.

consequences of taking her off the title to the residence and excluding her from the reverse mortgage loan. (Opp. at 6-13.) Plaintiff cites <u>Nymark</u> and the California Supreme Court in <u>Biakanja v. Irving</u>, 49 Cal.2d 647, 650, 320 P.2d 16 (1958) in support of this proposition.

■ <u>Nymark</u> delineates six factors which courts must balance to determine whether a financial institution owes a duty of care to a borrower-client:

[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

<u>Nymark</u>, 231 Cal.App.3d at 1098, 283 Cal. Rptr. 53 (quoting <u>Biakanja</u>, 49 Cal.2d at 650, 320 P.2d 16); <u>see also</u> <u>Wagner v. Benson</u>, 101 Cal.App.3d 27, 35, 161 Cal. Rptr. 516 (1980) (finding that liability to the borrow may arise "when the lender actively participates in the financed enterprise beyond the domain of the usual money lender"). In addition, the Ninth Circuit has interpreted the California Supreme Court's decision in <u>Bily v. Arthur Young & Co.</u>, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) as limiting the application of the <u>Biakanja</u> principles. <u>See</u> <u>Glenn K. Jackson Inc. v. Roe</u>, 273 F.3d 1192, 1197–98 (9th Cir.2001). In <u>Bily</u>, the California Supreme Court emphasized that there were three policy concerns that had to be considered before a duty could be found under the <u>Biakanja</u> factors: (1) liability may in particular cases be out of proportion to fault; (2) parties should be encouraged to rely on their own ability to protect themselves through their own prudence, diligence and contracting power; and (3) the potential adverse impact on the class of defendants upon whom the duty is imposed. 3 Cal.4th at 399–405, 11 Cal.Rptr.2d 51, 834 P.2d 745.

■ Plaintiff contends that the <u>Nymark/Biakanja</u> factors weigh in favor of finding that Wells Fargo owed Clarisa a duty. (Opp. at 9-10.) First, Plaintiff argues that the transaction was intended to affect both her and her husband because the mortgage was marketed to them both, both attended meetings with Hagar, and both resided in the residence as joint tenants. (<u>Id.</u> at 9.) Second, Plaintiff also contends that the foreseeability of harm is "self-evident" given the actuarial likelihood that Ken would predecease her. (<u>Id.</u>) Third, Clarisa claims she was actually harmed because Wells Fargo attempted to foreclose on her home and took fees from her community property. (<u>Id.</u>) Fourth, Plaintiff claims the connection between Wells Fargo's actions and Clarisa's injury is "direct" because she "would have avoided any injury but for" Wells Fargo's conduct. (<u>Id.</u>) Fifth, Plaintiff ascribes moral blame to Wells Fargo because "[p]ersons in the reverse mortgage business should be disclosing potential disastrous and adverse consequences to their elderly clients when marketing a reverse mortgage program to them." (<u>Id.</u> at 10.) Finally, Plaintiff contends that holding Wells Fargo liable promotes the policy of protecting vulnerable seniors. (<u>Id.</u>)

The Court is not persuaded by Plaintiff's arguments. Plaintiff's analysis assumes the Clarisa is a "borrower-client" of Wells Fargo. Clarisa was not a borrower-client of Wells Fargo. Clarisa's name does not appear on either of the Wells Fargo loan applications. (<u>See</u> March 23, 2005 Loan Application, Dkt. No. 78–1 at 142-148; April 29, 2005 Loan Application, Dkt. No. 78–1 at 186-189.) Hagar testified that the determination of whether to apply for the reverse mortgage as co-borrowers, or with

Ken as the sole borrower, would have been determined by the Weltes, not by Hagar. (Hagar Dep. at 130:9-15.) Hagar explained that if Ken had wanted her on the reverse mortgage, or if Clarisa had wanted to be on the reverse mortgage, then she would have included Clarisa's name on the loan application. (Id. at 130:15-18.) Moreover, when asked if she had ever facilitated the removal of an age-eligible co-owner of property from title to that property in a reverse mortgage loan application, Hagar testified that she could not "recall that ever happening." (Id. at 189:10-16.) That Hagar could not recall such a situation is evidence that she was not involved in the Weltes' decision to take Clarisa off the title. Likewise, there is no evidence that Hagar or anyone else at Wells Fargo ever persuaded or encouraged Clarisa to quit-claim her title in the residence to her husband. Indeed, there is no evidence that Hagar or anyone at Wells Fargo was ever under the impression that Clarisa was going to be on the loan. For these reasons, it cannot be said that the transaction was "intended to affect" Clarisa.

■ Although it may be said that closing the reverse mortgage loan knowing that Clarisa would not be included in the loan could cause her harm if Ken died first, "[m]ere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm." Nally v. Grace Community Church, 47 Cal.3d 278, 297, 253 Cal.Rptr. 97, 763 P.2d 948 (1988). Without any evidence establishing that Wells Fargo unduly influ-

enced Clarisa and/or Ken to remove Clarisa from title to the residence—as opposed to an independent decision made by Ken and Clarisa—no moral blame can be attached to Wells Fargo's conduct in executing a loan with Ken.[6] Moreover, the fact that the Weltes were required to undergo HUD counseling and obtain a certificate of completion prior to applying for a reverse mortgage reduces the foreseeability of harm and moral blame attached to Wells Fargo. Linda Sparrow, the HUD consultant, acted as an independent adviser to the Weltes on March 15, 2005—before Ken Welte first applied for the reverse mortgage. (PSUF ¶¶ 157, 158; DSUF ¶ 71.) The HUD counseling limited Wells Fargo's role in the transaction more so than a traditional lender's role in a forward mortgage because Wells Fargo could reasonably expect that HUD counselors advise potential borrowers of all risks and alternatives to reverse mortgages. Finally, "a strong public policy exists, if our financial institutions are to remain solvent, to prevent a conventional money lender from having to insure [the success of every investment]." Nymark, 231 Cal.App.3d at 1099, 283 Cal. Rptr. 53. Accordingly, the Biakanja factors do not support the imposition of a duty of care on Wells Fargo.

Plaintiff cites Jolley v. Chase Home Finance LLC, 213 Cal.App.4th 872, 153 Cal. Rptr.3d 546 (2013) and Alvarez v. BAC Home Loans Servicing LP, 228 Cal. App.4th 941, 176 Cal.Rptr.3d 304 (2014) for the proposition that where lending institutions mishandle loan applications or make

---

**6.** It is in this vein that the today's ruling is consistent with the Court's May 29, 2013 Order. In 2013, the Court found that Clarisa had alleged sufficient facts at the pleading stage to establish that Wells Fargo owed her a duty of care. (Dkt. No. 16 at 7.) The Court relied on Plaintiff's allegations that Hagar persuaded Clarisa and Ken to drop Clarisa from the property title and that Hagar encouraged

Clarisa to sign the quitclaim deed, which Clarisa alleged was not necessary to effect the reverse mortgage. (Id.) Clarisa has not been able to introduce any evidence that Hagar or anyone at Wells Fargo unduly influenced Clarisa to sign the quitclaim deed or influenced Ken and Clarisa to drop Clarisa from title to the residence.

specific representations to borrows concerning loans, the lenders owe a duty of care to the borrowers. (Opp. at 10.) However, California Courts of Appeal and district courts in this circuit are split as to whether these situations create a duty of care. See Lueras v. BAC Home Loans Servicing, LP, 221 Cal.App.4th 49, 67, 163 Cal.Rptr.3d 804 (2013) (disagreeing with Jolley "to the extent it suggests that a residential lender owes a common law duty of care to offer, consider, or approve a loan modification, or to explore and offer foreclosure alternatives"); Cornejo v. Ocwen Loan Servicing, LLC, 151 F.Supp.3d 1102 (E.D.Cal.2015) (declining to follow Alvarez and choosing instead to follow Lueras because even if the plaintiffs were "captive" to the financial lenders, there was no showing that they entered into any non-traditional, special relationship with the lender).

The Court is persuaded by the reasoning in Lueras and Cornejo. Although loan modifications and reverse mortgages are different, both are residential loan products designed for persons struggling to cover their monthly living expenses. As the California Court of Appeal explained in Lueras, "[a] lender's obligations to offer, consider, or approve loan modifications and to explore foreclosure alternatives are created solely by the loan documents, statutes, regulations, and relevant directives and announcements from the United States Department of the Treasury, Fannie Mae, and other governmental or quasi-governmental agencies." Lueras, 221 Cal. App.4th at 67, 163 Cal.Rptr.3d 804. As in Lueras, "[t]he Biakanja factors do not support imposition of a common law duty to offer or approve" a reverse mortgage application. Id.

The "relevant directives and announcements" from governmental agencies applicable to reverse mortgages are those issued by the HUD. In effect in 2005, the HUD required potential reverse mortgage borrowers to complete an independent counseling program designed to give them information about the implications of and alternatives to a reverse mortgage. (DSUF ¶ 14.) As such, the HUD assumed a duty of care with respect to providing all necessary disclosures to potential borrowers. To impose upon Wells Fargo a duty to disclose facts to non-borrowing, non-clients when it believed such disclosures were being made by the HUD is "out of proportion to fault" and has a "potential adverse impact on the class of defendants upon whom the duty is imposed." Bily, 3 Cal.4th at 399–405, 11 Cal.Rptr.2d 51, 834 P.2d 745. Moreover, in 2005, the HUD did not require lenders to provide non-borrowing spouse disclosures—such disclosures were not required until 2014. (DSUF ¶ 23.) Accordingly, Wells Fargo did not have a legal obligation to "explore [ ] alternatives" with Clarisa or make disclosures to her as a non-borrowing spouse.

■■■ Plaintiff makes two other arguments with respect to duty. First, she contends that 12 U.S.C. § 1715z–20(j) imposes a duty on Wells Fargo. (Opp. at 11.) This is incorrect. Section 1715z–20(j) imposes a duty on the Secretary of the HUD not to insure a reverse mortgage unless that mortgage provides that the homeowner's obligation to satisfy the loan obligation is deferred until the homeowner's death, the sale of the home, or other circumstances as provided for in HUD regulations. See 12 U.S.C. § 1715z–20(j). Pursuant to this section "homeowner" includes the homeowner's spouse. However, this section applies to the HUD. Nothing in this section imposes a duty of any kind on financial institutions. As such, it is inapposite.

■■■ Second, Plaintiff contends that Wells Fargo's training materials created a duty of care. (Opp. at 11-13.) This argument also fails. It is true that an organiza-

tion's internal policies and manuals may be admissible as evidence regarding whether a defendant met a standard of care, but there is no authority for the proposition that a private defendant's training materials create a duty of care where no duty exists. See Lugtu v. California Highway Patrol, 26 Cal.4th 703, 110 Cal.Rptr.2d 528, 28 P.3d 249 (2001) (finding that the provisions of a police safety manual "may not properly be viewed as establishing the applicable standard of care, but they may be considered by the trier of fact in determining whether or not an officer was negligent in a particular case"); Beal v. Blumenfeld Theatres, Inc., 177 Cal.App.2d 192, 194, 2 Cal.Rptr. 110 (1960) (holding that a violation of the defendant's internal policies for its employees could not constitute negligence per se, but could be admissible for the jury to consider in determining whether the defendant was negligent).

Because, as a matter of law, Wells Fargo did not owe a duty to Clarisa to disclose to her the consequences of being removed from title of the residence prior to the close of escrow on the reverse mortgage, Plaintiff cannot prevail on her claims of negligence, deceit by concealment or non-disclosure, and constructive fraud. Accordingly, the Court GRANTS Wells Fargo's motion for summary judgment as to these claims.

### B. Financial Elder Abuse

■ Plaintiff claims that Wells Fargo recklessly, and by oppression and fraud, deprived Plaintiff of her property right and interest in the home, thereby committing financial abuse of an elder. Financial abuse of an elder is defined in California Welfare & Institutions Code section 15610.30 (known as the "Elder Abuse Act"):

(a) "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

(2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

(3) Takes, secretes, appropriates, obtains, retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 1575 of the Civil Code.

(b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.

(c) For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult.

■ The parties dispute whether any actions by Wells Fargo constituted a wrongful "taking" for purposes of the Elder Abuse Act. (See Mot. at 19-20; Opp. at 24-25.) Plaintiff contends a "taking" occurred when the loan commission and fees due to Wells Fargo were deducted from the loan proceeds at closing. (Opp. at 24.) These fees were allegedly "sourced from

the equity in the Welte home." (Id.) However, at the time of closing, Clarisa was not record title owner of the property because she had quitclaimed the property to Ken. Accordingly, she had no ownership of the equity in the Welte home at the time of the alleged taking. Moreover, as discussed above, the Court does not find that Wells Fargo owed Plaintiff a duty to disclose the consequences of being removed from title to the property prior to the execution of the loan. Therefore, there is no evidence that Wells Fargo acted "wrongfully" or with the intent to defraud when it closed the reverse mortgage loan.

■ Plaintiff also contends that a taking occurred when Wells Fargo recorded a notice of default on the property after Ken died. (Opp. at 24-25.) This argument also fails. Wells Fargo commenced foreclosure proceedings because, under the terms of the reverse mortgage, the loan became due and payable upon Ken's death. Because Plaintiff has offered no evidence that Wells Fargo either exercised undue influence over her or wrongfully took real property belonging to her, Wells Fargo is entitled to summary judgment on this claim. See Kerrigan v. Bank of Am., No. EDCV 09–02082 DDP, 2011 WL 3565121 (C.D.Cal. Aug. 12, 2011) (granting summary judgment on a non-borrowing spouse's Elder Abuse Act claim where the non-borrowing spouse presented no evidence that the lender exercised undue influence or wrongfully took real property belonging to him). The Court GRANTS Wells Fargo's motion for summary judgment on Plaintiff's financial elder abuse claim.

### V. CONCLUSION

For the foregoing reasons, Wells Fargo's motion for summary judgment is GRANTED. Plaintiff's Second Amended Complaint is DISMISSED WITH PREJUDICE. The Court ORDERS that such judgment shall be entered. The Clerk is directed to close the case.

**IT IS SO ORDERED.**